## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATURAL RESOURCES DEFENSE COUNCIL,
CENTER FOR BIOLOGICAL DIVERSITY, HUMANE
SOCIETY INTERNTIONAL, *and* HUMANE SOCIETY
OF THE UNITED STATES,

*Plaintiffs*,

*vs.*

Case No.

COMPLAINT

RYAN ZINKE, in his official capacity as Secretary of the
Interior, DEPARTMENT OF THE INTERIOR, U.S.
FISH AND WILDLIFE SERVICE, JIM KURTH, in his
official capacity as Acting Director of the U.S. Fish and
Wildlife Service, *and* GREG SHEEHAN, in his official
capacity as Principal Deputy Director of the U.S. Fish and
Wildlife Service,

*Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## INTRODUCTION

1.      This case concerns Defendants' decision to reward a small band of trophy

hunting enthusiasts and politically-connected donors by granting those individuals an

outsized opportunity to craft federal wildlife policy.  For decades, this group has sought

to relax or eliminate federal laws that impede its chosen pastime: the international

hunting of imperiled species – such as lions, elephants, and rhinos – for trophies and for

profit.  Now, acting under an ill-gotten federal imprimatur, these individuals are moving

quickly to achieve their goals.

2.      The outsourcing of federal conservation policy to the trophy hunting

industry violates the Federal Advisory Committee Act ("FACA"), which was enacted in

1972 to curb the executive branch's reliance on superfluous and secretive "advisory

committees:" ad hoc, non-federal bodies that nonetheless counseled governmental decisionmakers on significant swaths of national policy.  Prior to FACA, special interests had used these committees – and the associated veneer of governmental legitimacy – to drive federal decisionmaking outside the light of public scrutiny, participation, and debate.

3.      Accordingly, FACA establishes strict requirements for the creation and conduct of federal advisory committees.  Every advisory committee must be in the public interest, fairly balanced among competing points of view, and structured to avoid inappropriate influence by special interests.  Additionally, committees must make their meetings open to the public and disclose all documents produced to or by their membership.

4.      In the fall of 2017, Secretary Zinke – who has accepted tens of thousands of dollars of campaign contributions from the trophy hunting industry – created the deceptively named "International Wildlife Conservation Council" ("IWCC" or "Council"), a federal advisory committee stacked solely with representatives of the hunting, firearm, and animal trade industries.

5.      Allegedly designed to promote conservation, the Council actually exists to promote the anthesis of sound conservation policy: the hunting of imperiled species as a means to import their heads, hides, tusks, feet, and other body parts.

6.      Because the Council's actual operations are incompatible with its purported goals and with the mission and statutory mandates of the United States Fish and Wildlife Service ("FWS"), Defendants are only able to maintain the Council by continuously violating FACA.

7.      Instead of fairly balancing points of view on the Council, for example, Defendants stacked it almost exclusively with individuals who retain personal and financial interests in lowering regulatory safeguards for importing exotic animals and their parts, and excluded from the Council any scientist, economist, or expert in international wildlife conservation.

8.      And despite creating a Council consisting almost entirely of members or representatives of special interest groups with a stake in trophy hunting (such as Safari Club International and the National Rifle Association), the Department of the Interior ("DOI" or the "Department") has failed to guard against inappropriate influence by those groups.  The Council's charter, for example, is entirely devoid of provisions that could conceivably moderate the influence of the hunting interests dominating the Council.

9.      Likewise, the Council has worked to keep its operations secret, limiting access to its meetings and failing to release documents related to those meetings, flouting FACA, FACA's implementing regulations, and longstanding Department policy.

10.     Defendants' failure to adhere to FACA injures Plaintiffs – non-profit organizations committed to effective and science-based conservation strategies – by facilitating the development of federal wildlife policy in secret and without debate.  And by refusing to balance points of view on the Council and operating without adequate opportunity for public input and discussion, the Council directly hinders Plaintiffs' statutory rights to information and participation with respect to federal wildlife policy, and increases the likelihood that Plaintiffs' memberships will be injured by policies engineered to benefit only representatives of the trophy hunting industry.

11.     Although the Council has met at least twice, it is no closer to satisfying its obligations under FACA than it was when Secretary Zinke signed its charter.  With another Council meeting looming this fall – and with the Council continuing to develop concrete policy recommendations – Plaintiffs can only conclude they will be permanently shut out of Council business.

12.     To arrest these violations of FACA before the illegally-charted Council further cements the nation's wildlife policy, Plaintiffs respectfully seek relief from this Court in the form of an order setting aside the Council's charter and enjoining Defendants from accepting advice or recommendations from the Council.

## PARTIES

13.     Defendant RYAN ZINKE is the Secretary of the Department of the Interior and has ultimate authority over the IWCC's formation, composition, administration, and termination.  Secretary Zinke also has ultimate responsibility for the administration and implementation of the Endangered Species Act ("ESA") with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior.  He is sued in his official capacity.

14.     Defendant the UNITED STATES DEPARTMENT OF THE INTERIOR is an agency within the executive branch of the federal government, and is responsible for administering, among other things, implementation of the ESA and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

15.     Defendant the UNITED STATES FISH AND WILDLIFE SERVICE is an agency of the United States, housed within the Department of the Interior, responsible for

administering the provisions of the ESA with regard to threatened and endangered terrestrial species, including elephants, rhinos, and lions.

16.     Defendant JIM KURTH is Acting Director and Deputy Director for Operations of the United States Fish and Wildlife Service.  Acting Director Kurth is sued in his official capacity.

17.     Defendant GREG SHEEHAN is Principal Deputy Director of the United States Fish and Wildlife Service.  Principal Deputy Director Sheehan is sued in his official capacity.

18.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL is a national, not-for-profit environmental organization, headquartered in New York City, with more than three million members and online activists.  On behalf of its members, NRDC's lawyers, scientists, and other environmental specialists engage in research, advocacy, public education, and litigation to protect the world's natural resources, public health, and environment.  NRDC has long placed a priority on wildlife conservation, working to extend protections to numerous species via robust and aggressive implementation of the ESA and advocacy at CITES.

19.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit 501(c)(3) corporation that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in species and habitat protection issues and has more than 63,000 members throughout the United States and the world, including in Africa.  The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C.; San Francisco, Joshua Tree, and Los Angeles, California; St. Petersburg, Florida; Portland, Oregon;

Silver City, New Mexico; Richmond, Vermont; Minneapolis and Duluth, Minnesota;

Seattle, Washington; and other locations.

20.     The Center seeks protections for imperiled species in other countries under

United States and international law and has fought for protections for wildlife such as

elephants, lions, giraffes, rhinos, leopards, and other species commonly targeted by

trophy hunters.  The Center also works to protect imperiled species in their habitat, and

its members and staff enjoy observing imperiled – and often trophy-hunted – species in

the wild.

21.     Plaintiff HUMANE SOCIETY INTERNATIONAL ("HSI") is a global

non-profit organization headquartered in Washington, D.C. with offices and programs

around the world.  HSI works to protect animals from abuse, including wildlife

trafficking and trophy hunting, and has expended substantial organizational resources

advocating for increased protection of elephants, lions, rhinos, and leopards (four of the

so-called "Big Five" species targeted by trophy hunters).  In order to achieve the most

stringent scrutiny of trophy imports, HSI successfully petitioned FWS to list the African

lion under the ESA, submitted a petition to "up-list" the African elephant to endangered

status under that Act, and has petitioned to eliminate loopholes allowing the import of

leopard trophies.  HSI actively advocates at the state, federal, foreign, and international

level against unsustainable trade in wildlife parts and products, and regularly monitors

the import and export of wildlife specimens.  HSI also works with local authorities in

African range states to improve management and protection of elephants, lions, rhinos,

and leopards.

22.     For example, HSI has implemented a program to administer contraception to South African elephant populations that had previously been controlled by slaughter. HSI has also partnered with local organizations in Zimbabwe to educate the public about humane wildlife management, and to protest the sale of elephants to China.  HSI works with Namibian communities to reduce human conflict with lions, and strives to decrease demand for trade in wildlife parts and products for commercial sale and medicinal use. The recreational killing of these imperiled species by hunters undermines HSI's efforts by normalizing lethal activities.

23.     Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a non-profit organization headquartered in Washington, D.C., with members who are personally vested in ensuring the continued survival of some of the world's most iconic imperiled species.  HSUS has petitioned FWS to list elephants, lions, leopards, and chimpanzees as endangered in order to curtail the import of hunting trophies and the domestic trade in such wildlife, and has commented in opposition to hundreds of permit applications to import endangered species trophies or to kill endangered species in the United States.  Further, HSUS has litigated in defense of FWS decisions prohibiting the import of elephant trophies from Zimbabwe and Tanzania due to those countries' unsustainable management of elephant populations.

24.     Plaintiffs bring suit on behalf of their members, who derive scientific, aesthetic, recreational, and spiritual benefits from imperiled species that are commonly hunted for trophies, including elephants, lions, giraffes, leopards, and rhinos.  For example, Plaintiffs have members who have recently visited Africa to view lions, elephants, rhinos, leopards, and giraffes in the wild, and who have plans to visit Africa in

the near future to view these animals in their natural habitats.  These members' interests
in protecting imperiled populations from harm and extinction are injured when the federal
government authorizes United States hunters to kill and import members of those species.

25.     Additionally, Plaintiffs' members rely on the full and transparent release
of government information – often obtained through the efforts of Plaintiffs themselves –
to stay informed of federal wildlife policies and laws.

26.     Plaintiffs also bring this suit on their own institutional behalf.  An
important component of Plaintiffs' missions is educating their members and the public
concerning the federal government's role in the international conservation of threatened
and endangered species.  Thus, Plaintiffs routinely communicate with and inform their
memberships concerning proposed rulemaking, policy, and legislation through social
media, newsletters, action alerts to their members, and other communications.

27.     Plaintiffs' ability to provide such information is compromised when the
government relies on opaque and procedurally-inadequate advisory committees to shape
executive rulemaking and policymaking.  Absent the disclosures required by FACA,
Plaintiffs are unable to inform their members or the public concerning the Council's
deliberations and proposals, preventing meaningful participation in Council processes
and related agency actions.

28.     Similarly, Plaintiffs' ability to meaningfully participate and advocate for
policies consistent with their interest is compromised by Defendants' noncompliance
with FACA.  Having been excluded from the Council, and given that representation on
the Council hails from hunting, firearm, and animal trade industries, Plaintiffs are
required to expend time and other organizational resources to keep abreast of the Council

and its activities.  Plaintiffs have devoted staff time for the purposes of obtaining Council

records that should be public, attending and recording Council meetings in Washington,

D.C., and Atlanta, Georgia (the Council has not released transcripts, detailed minutes, or

recordings of Council meetings), and making Plaintiffs' views on Council business

known to agency officials at DOI and FWS.  Defendants' failure to comply with FACA's

requirements has thus created an involuntary drain on Plaintiffs' organizational resources.

29.     Plaintiffs' exclusion from the Council and its deliberations also

undermines their work assisting organizations and governmental agencies in other

countries to strengthen those nations' wildlife policies.

30.     For example, Plaintiffs serve on intersessional CITES working groups

addressing issues attendant to the treaty's implementation, such as importation

procedures for wildlife parts (including trophies).  Plaintiffs also attend and participate in

CITES meetings on the designation of species on the CITES appendices (which provide

the international regulation for trade in imperiled species).  Plaintiffs also have on-the-

ground and scientific knowledge of conservation efforts for imperiled species targeted by

trophy hunters, and are able to contribute to policy debates concerning trophy hunting –

an often divisive issue – by offering scientific, economic, and practical knowledge about

the ramifications of hunting for imperiled species.  By excluding Plaintiffs from the

Council and shielding much of the Council's work from public view, Defendants reduce

Plaintiffs' access to information concerning United States policy, impeding Plaintiffs'

ability to carry out their work.

31.     Each of these injuries is caused by the Defendants, who collectively exercise control over the Council's charter, disclosures, and meetings (and, therefore, the Council's policy recommendations).

32.     Likewise, these injuries are redressable by an order from this Court setting aside the Council's founding documents, prohibiting Defendants from relying on Council recommendations, and/or requiring Defendants to comply with FACA's requirements.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Federal Advisory Committee Act, 5 U.S.C. § App. 2, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff NRDC is headquartered in New York.

## LEGAL BACKGROUND

### A.  The Federal Advisory Committee Act

35.     A "sunshine law," FACA demands transparency and public participation when the executive branch establishes or uses non-federal bodies for the purpose of seeking advice.  Thus, a federal agency may only form an advisory committee after it has "determined as a matter of formal record, after consultation with the [General Service Administration ("GSA")], with timely notice published in the Federal Register, [that the committee is] in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. App. II § 9(a)(2).  Likewise, the agency forming the advisory committee must render and explain a "[d]etermination of need in the public

interest," including a finding that the committee is "essential to the conduct of agency business and . . . the information to be obtained is not already available through another advisory committee or source within the Federal Government."  41 C.F.R. § 102–3.30(a).

36.     When passing FACA, Congress explained that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns," citing in particular an Industrial Waste Committee where "only representatives of industry were present[,]" and "[n]o representatives of conservation, environment, clean water, consumer, or other public interest groups were present."  H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

37.     To ensure that special interests do not control the advice rendered by advisory committees, FACA requires "the membership of [an] advisory committee to be fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee."  5 U.S.C App. II § 5(b)(2), (c).

38.     Likewise, the advisory committee's charter must contain appropriate provisions to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]"  5 U.S.C. App. II § 5(b)(3), (c).

39.     Once established, an advisory committee must include and facilitate public comment and participation.  Thus, an advisory committee must provide "timely notice" of its meetings to the public, 5 U.S.C. App. II § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with [the] committee, subject to such

reasonable rules or regulations as the Administrator [of GSA] may prescribe," *id.* § 10(a)(3).

40.     The Administrator of the GSA has implemented these statutory obligations by requiring advisory committees to publish notice of their meetings "at least 15 calendar days prior" to the meetings, unless documented and "exceptional circumstances" require otherwise.  41 C.F.R. § 102–3.150.  All meetings must be held "in a manner or place reasonably accessible to the public" and allow "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit."  *Id.* § 102–3.150(a), (d).

41.     Beyond FACA's requirement for public notice and participation, an advisory committee must also make available "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the committee.  5 U.S.C. App. II § 10(b).  Pursuant to the Department's Manual, these obligations extend to the IWCC's subcommittees and working groups.  *See* DOI, Department Manual, 308 DM 2.11, *available at* https://www.doi.gov/elips/browse.

42.     These materials must be released well *before* the relevant meeting, so that the public can "follow the substance of the [committee's] discussions."  *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992).

**B.  The Administrative Procedure Act**

43.     The APA allows a person "suffering legal wrong because of agency action, or adversely aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. §§ 702-704.  Under the APA, a reviewing court may "compel agency action

unlawfully withheld or reasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," *id.* § 706(2).  Because FACA does not provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA.  *See* 5 U.S.C. § 701(a).

**C.  The Endangered Species Act**

44.     The ESA, 16 U.S.C. §§ 1531-1544, is the most comprehensive legislation for the preservation of threatened and endangered species ever enacted by any nation.  In passing the Act, Congress found that different species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction."  16 U.S.C. § 1531(a)(1)-(2).

45.     In the ESA, Congress established "a program for the conservation of such endangered species and threatened species" and required federal agencies to "utilize their authorities in furtherance of the purposes of" the ESA by committing "to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction . . . ."  16 U.S.C. § 1531(a)(4), (b), (c)(1).

46.     Under the ESA, the Secretary "shall" list species that are "endangered" or "threatened" by one or more of five factors, based upon the best available science.  16 U.S.C. § 1533.  The import and export of species listed as "endangered" under the ESA (including their parts) is prohibited under Section 9 of the Act, *id.* § 1538(a), (d), and is

generally prohibited for "threatened" species by regulation, *id.* § 1533(d), [1] subject to

certain exceptions set forth in Section 10 of the Act, *id*. § 1539(a)(1)(A) (permitting

imports of trophies only if hunting the animal enhances the survival of the species).

### D. The Convention On International Trade In Endangered Species of Wild Fauna And Flora

47.     The United States is a signatory to CITES, an international conservation

treaty designed to ensure that international trade in animals and plants does not threaten

their survival.  Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249.  The Convention

recognizes that "wild fauna and flora in their many beautiful and varied forms are an

irreplaceable part of the natural systems of the earth which must be protected for this and

the generations to come."  CITES, preamble, 27 U.S.T. at 1090.

48.     Listing a species on CITES Appendix I or II restricts international trade in

that species or its parts.  In the case of Appendix I species, like black rhinos, export from

the country of origin is legal only if both that country and the destination country

determine such export will not be detrimental to the survival of the species.  For

Appendix II species, only the exporting country must render the non-detriment finding.

49.      In either case, a non-detriment finding for trade in a hunting trophy must

consider the effects of both the export and the hunting itself.  *See* CITES, art. III, IV, VII.

These findings are crucial for ensuring that the export of animal parts does not facilitate

poaching and black market trading, with all the attendant threats to imperiled species.

//
//
//
//
//

---

[1] *See, e.g.* 50 C.F.R. § 17.40(e), (r) (rules for elephants and lions).

## FACTUAL BACKGROUND

### A.  Interior's International Conservation Programs

50.      International conservation – including transnational partnerships – is of critical importance to the survival of numerous species and ecosystems across the world. As FWS explains in its current International Affairs Program Strategic Framework:

> The survival of living resources important to the American public depends on effective international conservation.  Global issues and challenges such as illegal and unsustainable trade in wildlife and plants, inadequate governance, and landscape-scale habitat alteration are increasingly important threats to species and habitats.[2]

51.      FWS engages in these issues "in the context of a number of long-standing commitments . . . contained in domestic laws, international treaties, and other unilateral agreements."  *Id*.   These commitments include CITES, the ESA, the Multinational Species Conservation Acts, the Lacey Act, the Wild Bird Conservation Act, and other federal laws and international agreements.

52.      As part of this conservation mission, FWS's International Affairs division operates the Wildlife Without Borders and International Wildlife Trade programs, which "work with private citizens, local communities, other Federal and State agencies and foreign governments, as well as non-governmental organizations, scientific and conservation organizations, industry groups, the private sector, and other interested parties to ensure effective implementation of treaties and laws, and the global conservation of species."  *Id*. at 8.

---

[2] FWS, International Affairs Program Strategic Framework 2014-2019 at 3 (Aug. 2014), *available at* https://www.fws.gov/international/strategic-plan.pdf.

53.     These programs advance international conservation on several fronts, from "[b]uilding networks to analyze action and promote exchange of information and best practices" to "[p]rovid[ing] technical and financial resources to support on-the-ground conservation action" and "[i]nfluenc[ing] species and habitat management decision-making, coordinat[ing] biological research, and monitor[ing] species populations and threats through effective implementation of international commitments and through partnerships with governments." *Id.* at 4-5.

54.     In recent years, FWS relied on two federal advisory committees to provide the agency with advice on certain aspects of its conservation mandate: the Wildlife and Hunting Heritage Conservation Council ("WHHCC") and the Advisory Council on Wildlife Trafficking ("ACWT").

55.     The WHHCC brought together representatives of the hunting and conservation communities, such as the National Wildlife Federation and Nature Conservancy, the Boone and Crockett Club, and the National Shooting Sports Foundation.  Its mission was to "provide[] advice about wildlife and habitat conservation endeavors" benefiting "wildlife resources."[3]  Beginning in 2010, the WHHCC provided recommendations on subjects of public interest such as "[f]ostering wildlife and habitat conservation and ethics in hunting and shooting sports recreation" and "[p]roviding recommendations to improve implementation of Federal conservation programs that benefit wildlife, hunting, and outdoor recreation on private lands." *Id*. ¶ 4.  For example, in 2012, 2014, and 2016, the WHHCC discussed and offered recommendations to FWS

---

[3] DOI, Wildlife and Hunting Heritage Conservation Council, 2016 Charter ¶¶ 3-4 (Feb. 2016), *available at* https://www.facadatabase.gov/committee/charters.aspx?cid=2299 &aid=43.

regarding international trophy hunting and FWS permitting requirements for the import

of hunting trophies.

56.     The ACWT was constituted by the Secretary of the Interior in 2013 to

"advise and make recommendations . . . on issues relating to combating wildlife

trafficking," such as "[e]ffective support for anti-poaching activities," "[d]eveloping and

supporting effective legal enforcement mechanisms," and "[d]eveloping strategies to

reduce illicit trade and reduce consumer demand for illegally traded wildlife, including

protected species."[4]  Its membership comprised a range of experts from the non-profit

and private sectors, including the heads of the World Wildlife Fund and the African

Wildlife Foundation and a former wildlife crimes prosecutor.

57.     The ACWT was one component of the federal government's National

Strategy for Combatting Wildlife Trafficking, which sought to address the international

crisis in poaching and illegal trade in animals and their parts.[5]  Shortly after the Strategy's

release, for example, FWS responded to a wave of elephant poaching in Tanzania and

Zimbabwe by prohibiting the import of elephant trophies from those countries.[6]

//
//
//
//
//

---

[4] FWS, Advisory Council on Wildlife Trafficking, 2013 Charter, ¶ 4, (*date signed* July
24, 2013, *date filed* Aug. 30, 2013), *available at* https://www.fws.gov/international
/pdf/filed-charter-2013-advisory-council-wildlife-trafficking.pdf.
[5] National Strategy for Combating Wildlife Trafficking (Feb. 11, 2014), *available at*
https://obamawhitehouse.archives.gov/sites/default/files/docs/
nationalstrategywildlifetrafficking.pdf.
[6] FWS, Press Release, Service Suspends Import of Elephant Trophies from Tanzania and
Zimbabwe (April 4, 2014), https://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-
E10F-82BC-DAE08807810E3C6B.

**B.  The Threat Of International Trophy Hunting To Imperiled Species**

58.     A significant portion of international "trophy hunting" focuses on large and often rare animals, such as the "Big Five" species of Africa: lions, elephants, rhinos, leopards, and Cape buffaloes.

59.     FWS places various restrictions and requirements on the import of hunting trophies to fulfill its obligations under federal law and international treaties, and to account for, *inter alia*, inadequate regulation in countries where trophy hunting transpires, the loss of hunting-related conservation revenue to corruption, the deleterious trafficking of rare and endangered species, and circumstances where hunting-related deaths of imperiled species outpace births.  *See, e.g.*, 16 U.S.C. § 1537(b) (requiring FWS to work with the Secretary of State to encourage foreign countries to promote the conservation of listed species).

60.     A single overseas trophy hunt tends to cost significantly more than the median household income for American families.  In South Africa, for example, the average cost for a lion hunt (including the trophy fee, guides, and lodging) is $71,000. [7] The cost for a white rhino trophy is upwards of $125,000.[8]

61.     While only a tiny minority of Americans engage in international trophy hunting, trophy hunting interests vigorously lobby to protect their financial interests. Safari Club International, for example, spent $710,000 on such efforts in 2016 alone. And four of the Council's members – Peter Horn, Chris Hudson, Mike Ingram, and Keith

---

[7] *See The Big Five: Africa's Most Sought-After Trophy Animals*, N.Y. Times, Aug. 10, 2015.
[8] *Id.*

Mark – were involved in a 2016 inaugural fundraiser advertising access to the President

elect in exchange for contributions of $500,000 or more.[9]

62.     These groups and individuals promote the controversial view that killing

rare animals contributes to the species' preservation.  The best available science indicates

otherwise.  For example, the trophy hunting of lions and elephants unnaturally selects for

smaller and weaker animals (therefore reducing a population's reproductive capacity),

decreases genetic variations and population density, and destabilizes social structures, all

with cascading impacts to populations.

63.     Consistent with this science, many conservationists, hunters, and

American citizens are skeptical of trophy hunting.  For example, a 2015 survey

conducted by Marist Institute for Public Opinion determined that 86% of Americans,

75% of gun owners, and 65% of hunters oppose trophy hunting of big game like

elephants and lions, with 62% of Americans, 48% of gun owners, and 34% of hunters

believing the practice should be prohibited by law.[10]

64.     Nor is trophy hunting a boon to local communities or developing

economies.  In Zimbabwe and other African countries popular with trophy hunters, for

---

[9] *See, e.g., Brochure for the Opening Day 45,* Opening Day Found. (Dec. 20, 2016),
*available at* https://www.scribd.com/document/334735934/Opening-Day-Sponsorship-
12-20-16; Matea Gold & David A. Fahrenthold, *Offer of Access to Trump and Family at
Fundraiser is Pulled Back, But Ties Remain,* Wash. Post, Dec. 20, 2016,
https://www.washingtonpost.com/politics/offer-of-trump-access-at-fundraiser-is-pulled-
back-but-family-ties-remain/2016/12/20/ec185520-c6ea-11e6-bf4b-
2c064d32a4bf_story.html?utm_term=.d95700d2c425.
[10] *See* Marist Poll, Press Release, *Americans Oppose Big Game Hunting…More Than Six
in Ten Favor Legal Ban* (Nov. 24, 2015), http://maristpoll.marist.edu/wp-
content/misc/usapolls/us151001/Sports/HBO%20Real%20Sports_Marist%20Poll_Compl
ete%20Survey%20Findings_November%202015.pdf.

example, trophy hunting contributes at most .03 percent of GDP, compared to between

2.8 and 5.1 percent for tourism writ large.[11]

65.    President Donald Trump has likewise weighed in against trophy hunting,

saying that he would be "hard pressed to change [his] mind that this horror show in any

way helps conservation of Elephants [sic] or any other animal."[12]

### C.    Secretary Zinke Improperly Charters And Staffs The One-Sided IWCC To Advance Trophy Hunting

66.    Prior to Secretary Zinke's confirmation, the DOI's two advisory

committees concerning wildlife conservation – the WHHCC and the ACWT – brought

multiple points of view to bear on the subject.

67.    To Secretary Zinke and the trophy hunting industry, this diversity of

viewpoints constituted a significant drawback.  In order to create an advisory committee

with a single-minded focus on the promotion of trophy hunting, Secretary Zinke let the

ACWT's charter lapse and then chartered the IWCC on November 3, 2017, with the

Department publicly announcing the Council on November 8, 2017.  *See* International

Wildlife Conservation Council Establishment; Request for Nominations, 82 Fed. Reg.

51,857, 51,857-58 (Nov. 8, 2017).  Secretary Zinke let the WHHCC's charter lapse four

months later.

68.    The IWCC's one-sided mandate is to "provide advice and

recommendations . . . focused on increased public awareness domestically regarding the

---

[11] Cameron K. Murray, Economist at Large, for Humane Soc'y Int'l, The Lion's Share? On the Economic Benefits of Trophy Hunting, at 3-4 (2017), http://www.hsi.org/assets/pdfs/economists-at-large-trophy-hunting.pdf.
[12] Donald J. Trump (@realDonaldTrump), Twitter, Nov. 19, 2017, https://twitter.com/realdonaldtrump/status/932397369655808001?lang=en.

conservation, wildlife law enforcement, and economic benefits that result from United

States citizens traveling to foreign nations to engage in hunting[,]" and to "advise the

Secretary on the benefits international hunting has on foreign wildlife and habitat

conservation, anti-poaching and illegal wildlife trafficking programs, and [on] other ways

in which international hunting benefits human populations in these areas."[13]

69.     The IWCC's Charter identifies several specific tasks the Council will

undertake, many of which have major ramifications for conservation policy.  For

example, the Council is tasked with "[r]ecommending removal of barriers to the

importation into the United States of legally hunted wildlife[,]" "providing

recommendations that seek to resume the legal trade of [banned] items," "providing

recommendations for regulations that will lead to a reduction of unwarranted [seizure and

forfeiture] actions[,]" and "[r]eviewing the Endangered Species Act's foreign listed

species . . . with the goal of eliminating regulatory duplications."[14]  As the IWCC

implements these policies, populations of imperiled wildlife will suffer from increased

poaching, hunting, and the trade in their parts.

70.     As noted, FACA and its implementing regulations require significant

preliminary findings when an agency creates an advisory committee.  Defendants ignored

these requirements when chartering the IWCC.

71.     The Secretary's only effort to comply with these requirements reads, in its

entirety: "I hereby certify that the [IWCC] is necessary and is in the public interest in

---

[13] IWCC, 2017 Charter, ¶ 3, (*date signed* Nov. 3, 2017, *date filed* Dec. 21, 2017),
*available at* https://www.facadatabase.gov/committee/charters.aspx?cid=2636&aid=43
("IWCC Charter").
[14] *Id.* ¶ 4(d)-(g).

connection with the performance of duties imposed on the Department of the Interior[,] 43 U.S.C. [§] 1457, under the provisions of the Fish and Wildlife Act of 1956 (16 U.S.C. [§] 742a-742j), and other Acts applicable to specific bureaus."  82 Fed. Reg. at 51,858.

72.    Thus, Secretary Zinke did not even attempt to explain how agency business or the public interest would be served by an advisory committee dedicated to serving the interests of a small cadre of trophy hunters.  Nor did the Secretary explain why the information to be obtained from the Council was not already available through the then-active WHHCC (or through renewal of the recently expired ACWT charter).

73.    Furthermore, Defendants designed the IWCC to violate FACA's requirement of a fairly balanced membership.  The Council's charter calls for no more than 18 members comprised of representatives from:

- The Departments of the Interior and State (acting ex officio);

- Wildlife and habitat conservation/management organizations;

- U.S. hunters actively engaged in international and/or domestic hunting conservation;

- The firearms or ammunition manufacturing industry;

- The archery and/or hunting sports industry; and

- The tourism, outfitter, and/or guide industries related to international hunting. [15]

74.    By its nature, this set of entities is not fairly balanced.  Four of the five non-governmental groups share the same vested interest in deregulating trophy hunting. Decreasing permitting fees and increasing the availability of trophy hunting opportunities will reduce costs or raise profits for each of those four groups and their members, such

---

[15] *See* IWCC Charter ¶ 12(b).

that each has the same incentive and point of view on all of the duties spelled out in the
IWCC's charter.

75.   The IWCC solicited nominations for Council membership on November 8,
2017.  The full list of nominations is not known because the IWCC has refused to make a
complete set of comments or nominations publicly available.   But organizations
dedicated to successful wildlife conservation and to humane wildlife management,
including Plaintiffs, nominated potential representatives.  Plaintiffs, for example, jointly
nominated Andrew Wetzler, the Deputy Chief Program Officer of NRDC.  Mr. Wetzler is
a wildlife trade expert with 20 years of experience in the Endangered Species Act,
CITES, and other relevant areas of law and policy.

76.   Consistent with the slanted intent of the IWCC – and without explanation
to Mr. Wetzler or the public – Defendants rejected Mr. Wetzler's nomination, along with
every other nominee who lacked an economic interest in liberalizing and lowering the
costs of trophy hunting or the import of imperiled wildlife.  As a result, the Council does
not include a single expert in global wildlife and habitat conservation, international trade,
or foreign aid.

77.   Instead, Defendants stacked the Council with representatives of a single
viewpoint.  The Council's entire membership consists of advocates for trophy hunting,
the proliferation of firearms, and the importation of exotic animals and/or their parts.
Thus, these individuals stand to benefit in some tangible, economic way if trophy hunting
and the import of animal trophies or exotic animals is deregulated.  For example, the
trophy hunters on the Council will more readily and cheaply be able to import animal

parts from foreign countries, and the hunting, firearms, and archery professionals will see more business.

78.     Six of the Council's membership have connections to the National Rifle Association or firearm manufacturers, and eight are connected with Safari Club International or Conservation Force (avowedly pro-trophy hunting organizations).  The last two organizations, in particular, have long sought to import more animal trophies by eliminating the requirements for CITES non-detriment findings and ESA enhancement findings, and by opposing efforts to protect imperiled species under the ESA and CITES in the first instance.

79.     The Council has spoken candidly of its lopsided membership.  At the Council's meeting in June, 2018, for example, Council member Steve Chancellor suggested that conservation community "join us, not fight us," tacitly conceding that no members of that community were among the Council's membership.  With no members of the conservation community actually sitting on the Council, member Keith Mark openly characterized those who might disagree with the Council's monolithic point of view as "a vocal subset of the population."

80.     Given the unlawfully unbalanced nature of the Council's membership, a separate requirement of FACA is vitally important: the requirement that advisory committees' establishing documents "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]"  5 U.S.C. § App. II § 5(b)(3), (c).

81.     This requirement is critical to the IWCC not only because the appointees have a nearly uniform economic and personal interest in promoting and deregulating trophy hunting and trophy importation, but because most of them are members of the same special interest groups.

82.     Despite this glaring risk, the Council's charter contains only a limited ethics provision prohibiting any member from participating in "deliberations or votes relating to a specific party matter before the Department or its bureaus and offices including a lease, license, permit, contract, grant, claim, agreement, or litigation in which the member or the entity the member represents has a direct financial interest."[16]

83.     The charter does not define what constitutes a "direct financial interest" and does nothing to prevent the many members of the National Rifle Association and Safari Club International from knowingly advancing the interests of those groups.  Nor does it do anything to prevent the Council's simpatico members from voting as a bloc.

84.     The charter is particularly troubling because there is already a distinct possibility that the Council is considering *ultra vires* action: at the Council's June meeting, Anna Seidman, Director of Litigation of Safari Club International (an organization connected to the majority of the Council's membership), addressed the entire Council by urging it to offer policy recommendations "beyond" the confines of its legal charter.

//
//
//
//
//

---

[16] IWCC Charter ¶ 13.

### D.  The IWCC Begins Conducting Its Business In Secret

85.     What the Council advertised as its first two meetings (held on March 16, 2018 and June 19, 2018) violated FACA's requirements for open meetings and transparency.

86.     The IWCC did not observe FACA's requirement that notice be published at least 15 calendar days prior to what was allegedly its first meeting; instead, the Council gave notice on March 2, just 14 calendar days before the meeting.[17]

87.     The IWCC then compounded this failure by turning away members of conservation groups who tried to attend the Council's meeting.  After giving unlawfully foreshortened notice, the IWCC set an arbitrary registration date of March 12, 2018 for attendance.  83 Fed. Reg. at 9022.  Employees of Plaintiffs NRDC and the Center sent numerous emails after that date requesting to attend, but received no response—and then were turned away at the door.  Similarly, an employee of the Center requested permission to address the Council at the first IWCC meeting, but was barred from speaking despite there being ample time to carry out the meeting's agenda.

88.     These limitations on attendance and participation were unreasonable and unjustified.  There were no plausible security concerns justifying the Department's refusal to admit attendees, as all attendees were required to pass through building security to enter.  Nor could the Council's exclusionary policies be explained by space constraints, as there was ample room in the meeting space for more attendees.

---

[17] *See* International Wildlife Conservation Council; Public Meeting, 83 Fed. Reg. 9021 (Mar. 2, 2018).

89.     On information and belief, Defendants have also held Council meetings in secret: both the evening before and the morning of the Council's first meeting, the full Council was invited to convene with DOI officials including Secretary Zinke, Deputy Secretary David Bernhardt, and Ben Cassidy, the agency's Senior Deputy Director for Intergovernmental and External Affairs and a former lobbyist for the National Rifle Association.

90.     Although Cassidy has deep ties to hunting and firearm interests, he failed to detail these arrangements when filing his mandatory financial disclosures upon entry to government service, and may have violated his ethics commitments by serving as the Council's point of contact during their initial meetings.[18]

91.     The Council's secret meetings were neither open nor disclosed to the public, and the Council has not released any records relating to the subjects of these meetings.

92.     Defendants' violations of FACA's open meetings requirements are all the more troubling because Defendants have also declined to heed the Act's requirements for disclosure of Council materials.  FACA requires dissemination of all materials prepared by or for the Council *prior to Council meetings*, but, on information and belief, the Council has failed to produce at least the following materials:

- Detailed agendas for Council meetings.

---

[18] *See, e.g.,* Gabriel Sandoval, *These Trump Staffers – Including an ex-NRA Lobbyist – Left Their Financial Disclosure Forms Blank*, ProPublica, June 28, 2018, https://www.propublica.org/article/these-trump-staffers-including-an-ex-nra-lobbyist-left-their-financial-disclosure-forms-blank; Chris D'Angelo, *Documents Raise More Ethics Issues for Ex-NRA Lobbyist Working for Ryan Zinke,* HuffPost, July 18, 2018, https://www.huffingtonpost.com/entry/ben-cassidy-nra-interior-wildlife-council-trophy-hunting_us_5b4d1136e4b0fd5c73be0bb5.

- At least four policy presentations – including PowerPoint slides and prepared speeches – offered to the Council by featured presenters at Council meetings.

- Lists of Council subcommittee memberships.

- Presentations to Council members on their ethics obligations.

- Reports on hunting in east African nations.

93.     Plaintiffs learned of some of these materials – such as policy presentations – when the materials were suddenly produced for the first time at Council meetings. Because these materials were not offered to the public *before* the Council meetings, their belated production violates FACA.

94.      Other materials, such as Council agendas and reports on hunting, have not yet been publicly acknowledged by the Council, and are evident only obliquely, from responses to Freedom of Information Act requests.

95.     The Council has also failed to make public recordings, transcripts, or detailed minutes of its two meetings.

96.     At the March 16 meeting, the Council established three subcommittees, with the purpose of making recommendations that would be adopted by the full Council.

97.     On information and belief, subcommittees have already begun meeting— but the IWCC has not announced those meetings to the public, provided any relevant documents to the public, or allowed public attendance.  The Department's internal guidance, however, requires subcommittees to adhere to the same requirements as the full committee.

98.     Nor has the IWCC made available comments filed in response to the

announcement of the charter, or the nominations for members.

**CLAIMS FOR RELIEF**

**Count One**
**Unlawful Creation of a Federal Advisory Committee**
**5 U.S.C. § 706, 5 U.S.C. App. II § 9, 41 C.F.R. § 102–3.30(a)**

99.     Plaintiffs repeat and incorporate by reference each of the forgoing

allegations as if fully set forth herein.

100.     FACA and its implementing regulations require certain findings and

procedures before an agency may create an advisory committee.  The IWCC does not

comply with these requirements.  In particular, Defendants have not adequately explained

why the IWCC is "in the public interest in connection with the performance of duties

imposed on that agency by law," 5 U.S.C. App. II § 9(a)(2), why the IWCC is "essential

to the conduct of agency business," 41 C.F.R. § 102–3.30(a), or why "the information to

be obtained [through the committee] is not already available through another advisory

committee or source within the Federal Government," *id.*

101.     To the contrary, the overall mandate of the committee – to "increas[e]

public awareness" about the supposed benefits of the tiny population of "U.S. citizens

traveling to foreign nations to engage in hunting" – is incompatible with the public

interest because it sacrifices open and balanced debate of appropriate conservation

measures in favor of the parochial, predetermined interests of certain industries and

wealthy political donors.  IWCC Charter ¶ 3.

102.     Accordingly, Defendants' creation of the IWCC is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority. 5 U.S.C. § 706(2).

## Count Two
### Failure to Disclose Advisory Committee Materials and to Provide for Public Participation, 5 U.S.C. § 706, 5 U.S.C. App. II § 10

103.     Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

104.     FACA and its implementing regulations require that Defendants be transparent and open when conducting advisory committee business, but the IWCC has unlawfully operated outside of the public eye.  In particular, Defendants have failed to:

(a) make available to the public the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the IWCC and its subcommittees and working groups, 5 U.S.C. App. II § 10(b);

(b) make available Council materials in advance of IWCC meetings, *id.*;

(c) provide minutes of the Council's meetings, *id.*;

(d) allow public participation at Council and subcommittee meetings, 43 C.F.R. § 1784.4-3(c);

(e) provide adequate notice of Council, subcommittee, and working group meetings, *id.* § 1784.2-2.

105.     Defendants' restrictions on public participation are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, and/or constitute agency action unlawfully withheld.  5 U.S.C. § 706(1), (2).

**Count Three**
**Failure to Fairly Balance Represented Points of View**
**5 U.S.C. § 706, 5 U.S.C. App. II § 5**

106.     Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

107.     FACA requires that an advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C App. II § 5(b)(2), (c).  The IWCC's stated function is to "provide advice and recommendations . . . focused on increased public awareness domestically regarding the conservation . . . benefits that result from United States citizens traveling to foreign nations to engage in hunting[,]" but the Council includes no representation from scientists, economists, or experts in wildlife conservation.  *See* IWCC Charter ¶ 3.

108.     Defendants rejected not only Plaintiffs' nominations but *all* nominations of individuals who might in any way represent Plaintiffs' point of view, or any other point of view that was not pre-committed to deregulating foreign trophy hunting and the import of rare animals.

109.     Defendants' failure to ensure that the IWCC is fairly balanced is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, and/or constitute agency action unlawfully withheld.  5 U.S.C. § 706(1), (2).

**Count Four**
**Failure to Include Provisions to Prevent Inappropriate Influence**
**5 U.S.C. § 706(2), 5 U.S.C. App. II § 5**

110.     Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

111.    All advisory committees must include "appropriate provisions to assure

that the advice and recommendations of the advisory committee will not be

inappropriately influenced by the appointing authority or by any special interest."

5 U.S.C. App. II § 5(b)(3).  The IWCC lacks provisions to assure against such influence

in light of the fact that all or nearly all of its membership directly benefits from the

hunting and hunting-related policies they are now evaluating.  In particular, the IWCC is

unlawfully comprised largely of members who are directly involved with federally-

regulated import/export permitting of protected species, or who are employed by

organizations with direct financial interests in such activities.  *See* 43 C.F.R. § 1784.2-

2(a).

112.    Defendants' failure to ensure that the IWCC will not be inappropriately

influenced by special interests is arbitrary, capricious, an abuse of discretion, not in

accordance with law, and in excess of their statutory authority, and/or constitute agency

action unlawfully withheld.  5 U.S.C. § 706(1), (2).

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that Defendants' creation and administration of the IWCC violates

the APA, FACA, FACA's implementing regulations, and Department guidance, and that

the establishment of the Council is therefore unlawful;

2.    set aside the IWCC's charter and all Secretarial orders and decisions

attendant to the IWCC's creation, including the appointments of individual committee

members and alternate members;

3.      through the named Defendants, enjoin the IWCC and any of its

subdivisions from meeting, advising the Secretary, and otherwise conducting committee

or subcommittee business;

4.      order Defendants to immediately release all materials prepared for the

IWCC or its subcommittees, and to provide a *Vaughn* index for such materials and those

withheld from production for any reason;

5.      enjoin Defendants from relying on any recommendations or advice from

the IWCC;

6.      award Plaintiffs their costs, attorneys' fees, and other disbursements for

this action; and

7.      grant any other relief this Court deems appropriate.

Dated: August 1, 2018                              Respectfully submitted,

                                           /s/ *Jeffrey B. Dubner*

                                           Jeffrey B. Dubner (JD4545)
                                           Travis J. Annatoyn (*pro hac* to be filed)
                                           Democracy Forward Foundation
                                           P.O. Box 34553
                                           Washington, D.C. 20043
                                           (202) 448-9090
                                           jdubner@democracyforward.org
                                           tannatoyn@democracyfoward.org