UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

Natural Resources Defense Council, *et al.*,

Plaintiffs,

–v–

Department of Interior, *et al.*,

Defendants.

18-CV-6903 (AJN)

OPINION & ORDER

---

ALISON J. NATHAN, District Judge:

Plaintiffs Natural Resources Defense Council, Center for Biological Diversity, Humane Society International, and Humane Society of the United States bring this action against Defendants, the Secretary of the Interior; the U.S. Department of the Interior ("Interior"); the U.S. Fish and Wildlife Service ("Fish and Wildlife"); the Director for Operations of Fish and Wildlife; and the Principal Deputy Director of Fish and Wildlife, all sued in their official capacities, alleging several violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. II §§ 1-15.

On November 14, 2018, Defendants filed a motion to dismiss the Complaint in this case pursuant to Rules 12(b)(1) and 12(b)(6). Dkt. No. 40. For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

## I. Background

The Court draws the following from the allegations in the Plaintiffs' complaint, which are taken as true at this stage of the litigation. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

A.      **The Federal Advisory Committee Act**

Congress enacted FACA to "ensure that new advisory committees be established only

when essential . . . that their creation, operation, and duration be subject to uniform standards and

procedures; that Congress and the public remain apprised of their existence, activities, and cost;

and that their work be exclusively advisory in nature." *Pub. Citizen v. United States Dep't of*

*Justice*, 491 U.S. 440, 446 (1989) (citing 5 U.S.C. App. II § 2(b)).  FACA "was enacted to cure

specific ills, above all the wasteful expenditure of public funds for worthless committee meetings

and biased proposals." *Id.* at 453.  FACA applies to any "advisory committee," which is defined

as "any committee, board, commission, council, conference, panel, task force, or other similar

group, or any subcommittee or other subgroup thereof" that is "established" by statute, or

"established or utilized" by the President or by one or more federal agencies, "in the interest of

obtaining advice or recommendations for the President or one or more agencies or officers of the

Federal Government." 5 U.S.C. App. II § 3(2).

Unless "specifically authorized by statute or by the President," an advisory committee

cannot be established without an agency head "determin[ing] as a matter of formal record" that

the committee is "in the public interest in connection with the performance of duties imposed on

that agency by law." 5 U.S.C. App. II § 9(a)(2).  As to the composition of such a committee,

"the membership of [an] advisory committee [must] be fairly balanced in terms of the points of

view represented and the functions to be performed by the advisory committee." 5 U.S.C. App.

II § 5(b)(2), (c).  Relatedly, a committee's charter must "contain appropriate provisions to assure

that the advice and recommendations of the advisory committee will not be inappropriately

influenced by the appointing authority or by any special interest, but will instead be the result of

the advisory committee's independent judgment[.]" 5 U.S.C. App. II § 5(b)(3).  Congress tasked

the General Services Administration ("GSA") with prescribing regulatory guidelines for advisory committees.  *See* 5 U.S.C. App. II § 7(c).

In addition, FACA requires a committee to almost always provide "timely notice" of its meetings, *id.* § 10(a)(2), and generally allow interested persons to "attend, appear before, or file statements with [the] advisory committee," *id.* § (a)(3).  Congress also required every advisory committee to publicize "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the committee. 5 U.S.C. App. II § 10(b).

### B.    The International Wildlife Conservation Council

On November 8, 2017, Interior announced the establishment of the International Wildlife Conservation Council ("IWCC" and "the Council"), an advisory committee, via a notice in the Federal Register.  Compl. ¶ 67; 82 Fed. Reg. 51,857, 51,857-58 (Nov. 8, 2017).  The IWCC was chartered to "provide advice and recommendations to the Federal Government, through the Secretary . . . focused on increased public awareness domestically regarding the conservation, wildlife law enforcement, and economic benefits that result from United States citizens traveling to foreign nations to engage in hunting," and to "advise the Secretary on the benefits international hunting has on foreign wildlife and habitat conservation, anti-poaching and illegal wildlife trafficking programs, and [on] other ways in which international hunting benefits human populations in these areas."  Compl. ¶ 68 (citing International Wildlife Conservation Council Charter ("Charter"), available at https://www.fws.gov/iwcc/pdf/international-wildlife-conservation-council-charter.pdf, ¶ 3).

The Council's Charter calls for the Council to be constituted by no more than 18 members, comprised of representatives from the Departments of the Interior and State, as well as "wildlife and habitat conservation/management organizations," "U.S. hunters actively engaged in

3

international and/or domestic hunting conservation," "[t]he firearms or ammunition manufacturing industry," "[t]he archery and/or hunting sports industry," and "[t]he tourism, outfitter, and/or guide industries related to international hunting."  Compl. ¶ 73 (citing Charter ¶ 12(b)).

Prior to the enactment of the IWCC, Interior had previously relied on two federal advisory committees to provide the agency with advice on certain aspects of its conservation mandate: the Wildlife and Hunting Heritage Conservation Council ("Wildlife and Hunting Council") and the Advisory Council on Wildlife Trafficking ("Wildlife Trafficking Council"). Compl. ¶ 54.  Secretary Zinke allowed both of these committees' charters to lapse.  *See* Compl. ¶ 67.

### C.     Plaintiffs' Lawsuit

Plaintiffs are non-profit organizations that work on issues related to wildlife conservation and the environment.  *See* Compl. ¶¶ 18-23.  Their complaint alleges four violations of FACA. *See* Compl. ¶¶ 99-112.  Specifically, Plaintiff charges that Defendants have violated: FACA's requirement that certain formal findings must be made to establish a committee (Count One); various transparency and public access requirements (Count Two); the requirement that advisory committee membership be fairly balanced (Count Three), and the requirement that appropriate safeguards against conflicts of interest must be established (Count Four).  FACA does not create a private cause of action.  Accordingly, Plaintiffs seek judicial review pursuant to Section 702 of the APA, which provides that a "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

### D.   Procedural Background

On November 14, 2018, Defendants filed a motion to dismiss. Dkt. No. 40. On December 7, 2018, Plaintiffs filed an opposition to Defendants' motion. Dkt. No. 45. The case was stayed from December 27, 2018 until January 28, 2019, due to a lapse in Government funding. After the stay was lifted, on February 8, 2019, Defendants filed a reply memorandum of law in further support of their motion. Dkt. No. 52. On February 21, 2019, Plaintiffs filed a sur-reply in opposition to Defendants' motion. Dkt. No. 55. The Court held oral argument on June 3, 2019.

## II.   Legal Standards

### A.   Rule 12(b)(1)

A motion brought under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction to hear the case. *See* Fed. R. Civ. P. 12(b)(1). Pursuant to Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is appropriate if the Court determines that it lacks the constitutional or statutory power to adjudicate the case. *See Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). A court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

### B.      Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570.  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  When considering a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the [factual] allegations contained in [the] complaint[.]" *Iqbal*, 556 U.S. at 678.  However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In resolving a motion to dismiss under Rule 12(b)(6), review is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### C.      Standing

Article III restricts federal courts' authority to hear only those disputes involving "Cases" and "Controversies." U.S. CONST. art. III, § 2.  Accordingly, a party invoking a court's

jurisdiction must have standing to sue.  In order to have standing, a plaintiff must establish three

elements.  A plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "The plaintiff, as the party

invoking federal jurisdiction, bears the burden of establishing these elements." *Id.*  At the

pleading stage, a plaintiff need only "clearly allege facts demonstrating each element." *Id.*

(internal quotation marks omitted).  The standing inquiry also "in no way depends on the merits

of the plaintiff's contention that particular conduct is illegal," but instead "often turns on the

nature and source of the claim asserted." *Thompson v. Cty. of Franklin*, 15 F.3d 245, 249 (2d

Cir. 1994) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

When an organization argues it has standing in its own right, the inquiry is the same as if

the plaintiff were an individual.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

"[W]here, as here, multiple parties seek the same relief, the presence of one party with standing

is sufficient to satisfy Article III's case-or-controversy requirement." *Centro de la Comunidad

Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal

quotation marks omitted).

An organization can also assert "associational standing" on behalf of its members.  To

assert associational standing, an organization must show: "(a) its members would otherwise have

standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333, 343 (1977).

### D.    Justiciability

In cases involving a challenge to administrative action, "[t]here is a strong presumption favoring judicial review." *Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016). "In the absence of an express statutory prohibition, the agency bears the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of its decision." *Id.* (internal quotation marks and brackets omitted). This is subject to a narrow exception: the APA's prohibition against judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015). The exception applies only "when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct," *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015), and "only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008) (internal quotation marks omitted). "To determine whether there is law to apply that provides judicially manageable standards for judging an agency's exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." *Salazar*, 822 F.3d at 76 (internal quotation marks omitted).

## III.   Analysis

Defendants move to dismiss each of Plaintiffs' four claims for lack of standing. Defendants have also moved to dismiss Counts One and Two for failure to state a claim and Counts Three and Four as non-justiciable.

### A.    Defendants' Motion to Dismiss Count One is Denied in its Entirety

Count One alleges that the Secretary of the Interior failed to make certain requisite formal findings in establishing the IWCC. Compl. ¶¶ 99-102. In relevant part, under FACA, "[n]o

8

advisory committee shall be established unless such establishment is . . . determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. II § 9(a)(2). The relevant implementing regulations defining "[d]etermination of need in the public interest" state that "a discretionary advisory committee may be established only when it is essential to the conduct of agency business and when the information to be obtained is not already available through another advisory committee or source within the Federal Government." 41 C.F.R. § 102–3.30(a). According to Plaintiffs, Defendants have not adequately explained why the IWCC is "in the public interest," why it is "essential to the conduct of agency business," or why "the information to be obtained [through the committee] is not already available through another advisory committee or source within the Federal Government." Compl. ¶ 100. Defendants move to dismiss this claim for lack of standing and for failure to state a claim. The Court addresses each argument in turn.

### 1. Plaintiffs Have Sufficiently Alleged Organizational Standing

Plaintiffs argue that they have both organizational and associational standing as to Count One. For the reasons below, the Court finds that Plaintiffs have sufficiently alleged organizational standing. The Court therefore finds it unnecessary to reach Plaintiffs' associational standing arguments.

The Supreme Court and the Second Circuit have recognized that the diversion of an organization's resources can constitute an injury in fact. *See Havens*, 455 U.S. at 379; *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011). This is not a demanding standard, since "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Nnebe*, 644 F.3d at 157 (internal quotation marks omitted); *see also John v. Whole Foods*

9

*Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (describing the injury-in-fact requirement as a "low threshold").  The diversion of resources need not be monetary.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174–75 (2d Cir. 2005) (an organization expending resources to locate, recruit, manage, train, and supply volunteers conferred standing).  Additionally, when a defendant's actions impede an organization's ability to carry out its responsibilities, the plaintiff has suffered an injury in fact.  *See Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2011).

Plaintiffs have sufficiently alleged that the Council's general lack of transparency has caused them to devote greater "attention, time, and personnel" to monitoring the Council.  *Town of Oyster Bay*, 868 F.3d at 110-11.  Plaintiffs allege that "[a]n important component of Plaintiffs' missions is educating their members and the public concerning the federal government's role in the international conservation of threatened and endangered species."  Compl. ¶ 26.  Accordingly, their "ability to provide such information is compromised when the government relies on opaque and procedurally-inadequate advisory committees to shape executive rulemaking and policymaking."  *Id.* ¶ 27.  Because of Defendants' alleged noncompliance from the outset with the transparency requirements of FACA, Plaintiffs were "required to expend time and other organizational resources to keep abreast of the Council and its activities."  Compl. ¶ 28.  Plaintiffs provide concrete examples of these increased monitoring efforts, which include sending more members to meetings, spending extra time preparing staff for meetings, and resorting to FOIA to obtain information Plaintiffs allege should have been publicly disclosed under FACA.  Cummings Decl. ¶¶ 26, 29-33, 35, 37.  Plaintiffs did not "need to deploy similar resources to monitor previous advisory committees" that focused on similar issues at Interior.

Hartl Decl. ¶¶ 19-20; Cummings Decl. ¶ 32-33.  Accordingly, Plaintiffs have diverted resources to monitoring the IWCC that could otherwise have gone to their other activities.  Plaintiffs have therefore sufficiently alleged that "their activities [have been] perceptibly impaired by" Defendants' lack of transparency and have "diverted at least some of their limited resources to remedy the harm" allegedly caused by Defendants' conduct.  *Town of Oyster Bay*, 868 F.3d at 121; *Nnebe*, 644 F.3d at 157.

As to Count One specifically, Plaintiffs argue that all the above harms were caused by Defendants' alleged violation of § 9(a)(2).  Because these later injuries occurred only because the Council existed in the first place, Plaintiffs contend that the improper creation of the Council caused all downstream injuries.  But the Court declines to adopt a rule under which there is always standing to challenge the creation of a committee so long as there is standing to challenge any of the committee's later actions.

Nonetheless, the Court concludes that Plaintiffs have sufficiently alleged that Defendants' failure to provide the findings required by § 9(a)(2) at the outset, compounded by Defendants' continuing lack of transparency, has contributed to Plaintiffs' diversion of resources.  As for the reasons given below in Section III(A)(2), the Court agrees with Plaintiffs' reading of § 9(a)(2) and accordingly this provision mandates that the Secretary must justify his formal findings upon establishing the Council.  Had he done so, this would have provided information relevant to Plaintiffs' mission of educating its members and the public.  For example, the Secretary would be required to explain why the Council is "essential to the conduct of agency business" and why "information to be obtained from the Council was not already available through the then-active [Wildlife and Hunting Council] (or through renewal of the recently expired [Wildlife Trafficking Council] charter)."  Compl. ¶ 72, 100.  The reasons that

11

the Secretary concluded that the previous committees needed to be replaced would be relevant to the IWCC's purpose and agenda, and therefore to Plaintiffs' mission of educating its members and the public about federal government internal conservation policy. Cummings Decl. ¶ 26, 40. Yet the "underpinning rationale for [these findings] was never provided." *Id.* ¶ 17. Drawing all reasonable inferences in Plaintiffs' favor, Defendants' failure to provide the rationale for these findings at the outset impeded Plaintiffs' mission of member and public education.

It is also a reasonable inference that this initial lack of transparency was exacerbated by an alleged general lack of transparency that has led Plaintiffs to divert increased resources to monitoring the Council to "discern [the] agenda" of how this "secretive . . . body is shaping federal wildlife policy." *Id.* ¶¶ 26, 33, 40. The allegedly secretive manner in which the Council has acted continues to make it difficult for Plaintiffs to discern the IWCC's operation and role in policy-making, compounding the initial harm. *Id.* ¶ 25-40. It is true that Defendants' alleged failure to comply with § 9(a)(2) may not have caused as much of a diversion of Plaintiffs' resources as other alleged violations. But "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Nnebe*, 644 F.3d at 157. Thus, drawing all reasonable inferences in Plaintiffs' favor, the Secretary's failure to provide sufficient justification upon establishing the Council contributed to Plaintiffs' diversion of resources.

Defendants counter that Plaintiffs offer no specific facts demonstrating that Defendants' actions specifically burdened Plaintiffs or forced them to expend resources. *See* Def. Br. 13. According to Defendants, Plaintiffs are advocacy organizations that would reasonably be expected to engage with the IWCC, regardless of the alleged FACA violations. *Id.* However, Defendants ignore Plaintiffs' allegations that specifically address the resources they have had to expend to monitor and understand the IWCC's activity, as opposed to their typical policy

12

advocacy process. *See* Hartl Decl. ¶¶ 19-20; Cummings Decl. ¶ 32-33.  Furthermore, "so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is the organization's noneconomic interest in encouraging a particular policy preference." *Nnebe*, 644 F.3d at 157 (internal quotation marks and brackets omitted).  Defendants also argue that Plaintiffs' choices are self-inflicted, voluntary budgetary choices, which do not confer standing.  Def. Reply Br. at 6.  But the allegations make clear that Plaintiffs would not have to expend these resources if not for the alleged FACA violations contained in the complaint. *See* Hartl Decl. ¶¶ 19-20; Cummings Decl. ¶ 32-33.  Here, "the challenged conduct . . . arrived at the [plaintiffs'] door and either created new work for [them] or burdened the work [they were] already doing." *Town of Oyster Bay*, 868 F.3d at 121.  Accordingly, Plaintiff has sufficiently alleged standing as to Count One.

### 2. Plaintiffs Have Sufficiently Alleged that Defendants Violated 5 U.S.C. App. II § 9(a)(2) and its Implementing Regulations

Turning now to the merits, Defendants move to dismiss Count One under Rule 12(b)(6) on the grounds that the allegations in the Complaint show that Defendants sufficiently complied with FACA.  The Court disagrees.

As noted above, FACA requires publication in the Federal Register of a finding that a new committee is "in the public interest," 5 U.S.C. App. II § 9(a)(2).  The relevant implementing regulations require findings that the committee be "essential to the conduct of agency business" and that "the information to be obtained is not already available through another advisory committee or source within the Federal Government," 41 C.F.R. § 102-3.30(a).  The regulations further elaborate that: "Reasons for deciding that an advisory committee is needed may include whether: (1) Advisory committee deliberations will result in the creation or elimination of (or change in) regulations, policies, or guidelines affecting agency business; (2) The advisory

13

committee will make recommendations resulting in significant improvements in service or reductions in cost; or (3) The advisory committee's recommendations will provide an important additional perspective or viewpoint affecting agency operations." 41 C.F.R. § 102-3.30.

In addition to FACA's specific requirements, it is also a longstanding principle of administrative law that "[a]n administrative agency has a duty to explain its ultimate action." *Cablevision Sys. Corp. v. F.C.C.*, 570 F.3d 83, 92 (2d Cir. 2009). This "inquiry must be searching and careful." *Nat. Res. Def. Council v. United States E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009)). "The record must show that the agency . . . examined the relevant data and articulated a satisfactory explanation for its action" and "the agency's decision must reveal a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and brackets omitted)). In this analysis, "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Accordingly, "boilerplate language" cannot satisfy this requirement. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014) ("programmatic boilerplate" is not a "reasoned explanation"); *Foster v. Mabus*, 895 F. Supp. 2d 135, 147 (D.D.C. 2012) (use of boilerplate language rendered decision arbitrary and capricious).

Yet boilerplate language is precisely what Defendants provided here. The notice published in the Federal Register was simply a rote restatement of the statutory language: "I hereby certify that the [IWCC] is necessary and is in the public interest in connection with the performance of duties imposed on the Department of the Interior . . . under the Fish and Wildlife

14

Act of 1956 . . . and other Acts applicable to specific bureaus." 82 Fed. Reg. 51,857, 51,858
(Nov. 8, 2017). The Secretary also failed to address why "information to be obtained from the
Council was not already available" from existing or previously-existing sources. Compl. ¶ 72.
Plaintiffs have therefore successfully alleged that Defendants did not provide a reasoned
explanation for the Council's creation. *See Nat. Res. Def. Council*, 658 F.3d at 215. Defendants
counter that the Secretary of the Interior is merely required to certify the necessity of the
committee to the public interest, not to justify the certification. Yet this argument is plainly
inconsistent with the bedrock principle of administrative law requiring a reasoned explanation
for agency action. *See State Farm*, 463 U.S. at 43. Similarly, while Defendants are correct that
that "[t]he level of detail in [the IWCC] certification is comparable to that . . . made by previous
Interior Secretaries," Def. Mot. at 30, Defendants point to no authority for the proposition that
past practice operates as an exception to the reasoned explanation requirement.

Accordingly, Defendants' motion to dismiss Count One is hereby DENIED in its entirety.

## B.     Defendants' Motion to Dismiss Count Two is Granted in Part and Denied in Part

Count Two alleges that Defendants have violated various of FACA's transparency and
public access requirements. FACA requires a committee to provide "timely notice" of its
meetings, 5 U.S.C. App. II § 10(a)(2), and to allow interested persons to "attend, appear before,
or file statements with [the] advisory committee," *id.* § (a)(3). FACA also requires every
advisory committee to publicize "the records, reports, transcripts, minutes, appendixes, working
papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the
committee. 5 U.S.C. App. II § 10(b). Finally FACA extends the definition of advisory
committees to include subcommittees. *Id.* § 3(2). Plaintiffs allege that Defendants have violated
these provisions of FACA by limiting access to meetings, failing to make required documents

15

publicly available, and failing entirely to comply with FACA's disclosure and access requirements with respect to IWCC subcommittees.  Compl. ¶¶ 85-98.

### 1.    Plaintiffs Have Sufficiently Alleged Informational Standing

Plaintiffs allege that Defendants' denial of information and access to meetings constitute an injury in fact.  The "denial of access to information can, in certain circumstances, work an injury of fact for standing purposes." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal quotation marks and citations omitted).  A plaintiff suffers this form of informational injury if "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *Id.* (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).

At oral argument, Defendants conceded standing as to Plaintiffs' claims regarding recordkeeping.  Transcript of June 3, 2019 Oral Argument ("Argument Transcript"), Tr. 4:14-17. Therefore, the next standing question is whether Plaintiffs have standing to challenge the alleged denials of access to public meetings.  The Court concludes that they do.

As discussed above, FACA requires timely notice of meetings and that interested persons be allowed to attend and appear.  5 U.S.C. App. II § 10(a)(2) & (3).  Plaintiffs allege that Defendants' failure to provide proper notice and access to meetings has limited Plaintiffs' ability to fulfill its mission of keeping its membership and the public informed.  Compl. ¶¶ 28-30.  It is a reasonable inference that Plaintiffs' inability to access certain meetings or to send sufficient staff to meetings would impede Plaintiffs' ability to gather and disseminate information to their members.  Defendants counter that Plaintiffs lack standing because they did not formally request to attend the meetings in question prior to the meetings.  Def. Reply at 2 n.2.  Defendants do not

provide any authority for the contention that this is necessary.  Instead, Defendants ask the Court

to import a rule from the FOIA context, in which a request for documents must be made before a

claim may be brought.  *Id.*   This analogy is unavailing.  Under FOIA, an agency's statutory

disclosure obligations arise only after a request has been made, 5 U.S.C. § 552(a)(3), whereas the

relevant provisions of FACA and its implementing regulations contain no such requirement, 5

U.S.C. App. II § 10(b); 41 C.F.R. § 102-3.150(a).

Defendants also contend that Plaintiffs cannot establish informational injury, since "the

IWCC has made minutes and/or transcripts of each meeting publicly available" on the FWS

official website.  Def. Mot. at 11 n.6.  The Court takes judicial notice of these publicly available

government documents.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127

F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (noting that "[c]ourts routinely take judicial notice" or

documents on official government websites).  Yet as of the date of this Opinion and Order, there

are no transcripts for two of the four meetings. *See International Wildlife Conservation Council,*

*Public Meeting Materials,* https://www.fws.gov/iwcc/#Meeting (last accessed September 11,

2019).  Furthermore, it is difficult to follow the transcripts in various places due to omitted

words.  For example, a search of the June 19, 2018 transcript turns up nearly six hundred

instances of "(unintelligible)" to denote a missing word.  *See NWX-FWS, June 19, 2018*

*Transcript,* https://www.fws.gov/iwcc/pdf/meeting-transcripts/june-meeting-transcript.pdf.[1]

---

[1] There are a number of places in which this not only excludes potentially relevant information, but renders the transcripts nearly incomprehensible.  For example, June 19 transcripts include the following exchange:
> Man 1: (John), (unintelligible) the international (unintelligible). I've never seen one (unintelligible).
> (John Lucas): Good, I'm glad.
> Man 1: (Unintelligible) knows very little about (unintelligible) except (unintelligible) and this (unintelligible) one thing that you mentioned along with (Peter) did (unintelligible) mention it, all of you talked about (unintelligible). We must have (unintelligible) for any

Accordingly, drawing all available inferences in Plaintiffs' favor, these documents do not remedy the alleged informational injury.

For the same reasons, Plaintiffs also have standing to challenge any secret meetings held by the IWCC. If Plaintiffs were unaware of certain meetings, they could not attend them or even ask permission to attend them, rendering it impossible gather and disseminate information to their constituent members. That harm is sufficient to confer standing. In sum, the Court finds that Plaintiffs have sufficiently alleged an informational injury in fact related to their lack of access to the IWCC's public meetings or lack of knowledge of secret meetings.

### 2. Plaintiffs Have Sufficiently Alleged Some, But Not All, of Their Claims that Defendants Violated FACA's Access and Transparency Requirements

Proceeding to the merits, Defendants argue that Count Two must be dismissed because Defendants have complied with all of their obligations regarding (a) open meetings, (b) recordkeeping, and (c) subcommittees. *See* Def. Br. at 31.

#### a. Open Meeting Requirements

Plaintiffs have sufficiently alleged that Defendants have violated FACA's open meetings requirements. As noted above, FACA requires that interested persons be allowed to "attend, appear before, or file statements with [the] committee," 5 U.S.C. App. II § 10(a)(3). Plaintiffs allege, *inter alia*, that the IWCC has unlawfully prevented their members from attending and participating in meetings in a variety of ways. Compl. ¶¶ 85-89, 91-98, 103-105. For example, Plaintiffs allege that some of their employees were turned away at the door because they had missed a registration deadline, even though they had subsequently repeatedly requested to attend

_____

(unintelligible) projects and that's the (unintelligible) picked up from all of (unintelligible).
*Id.* at 116.

18

but received no response.  Compl. ¶ 87.  Plaintiffs' employee was also prevented from speaking

at a meeting, even though allegedly ample time remained.  *Id.*  Finally, "Defendants have also

held Council meetings in secret," convening the full Council and Interior officials both before

and after public meetings.  *Id.* ¶ 89.

> Defendants counter that Plaintiffs allegations do not plausibly suggest that there have

been "secret" IWCC meetings outside of the view of the public.  *See* Def. Br. 32-34.  Yet

drawing all available inferences in Plaintiffs' favor, their allegations regarding surreptitious

convenings of the full IWCC are sufficient.  *See Twombly*, 550 U.S. at 555-56.  Defendants also

argue that they are allowed by FACA to set "reasonable rules or regulations" for public

participation and that the denial of Plaintiffs' members ability to attend or speak at these

meetings were the result of such reasonable regulations.  Def. Mot. at 32-33 (citing 5 U.S.C.

App. II § 10(a)).  Yet Plaintiffs have alleged that there are no security concerns, space

constraints, or time constraints that justified these rules.  Compl. ¶¶ 85-88.  At this stage, again

drawing all available inferences in Plaintiffs' favor, the Court cannot conclude as a matter of law

that Defendants' requirements for attendance and participation are reasonable.  Accordingly,

Plaintiffs have sufficiently alleged that Defendants have violated the open meeting requirements

of FACA.

### b.  Recordkeeping Requirements

> Similarly, Plaintiffs have stated a claim that Defendants have failed to meet their

recordkeeping requirements.  As noted above, committees are required to make a number of

documents publicly available, including "records, reports, transcripts, minutes, appendixes,

working papers, drafts, studies, agenda [and] other documents . . . made available to or prepared

for" the committee.  5 U.S.C. App. II § 10(b).  IWCC has allegedly not released any records

relating to the subjects of the alleged secret meetings.  Compl. ¶ 91.  More generally, Plaintiffs

allege that "[o]ther materials, such as Council agendas and reports on hunting, have not yet been publicly acknowledged by the Council, and are evident only obliquely, from responses to Freedom of Information Act requests." Compl. ¶ 94. Finally, Plaintiffs allege that transcripts and recordings of the meetings were either not released or were released with undecipherable sections. Compl. ¶ 95; Pl. Opp. at n.6. These allegations are sufficient to state a claim that Defendants have not complied with FACA's recordkeeping requirements.

On the other hand, the Court concludes that Plaintiffs have failed to state a claim that Defendants violated FACA by not disseminating materials *prior* to meetings. Plaintiffs allege that Defendants failed to provide access to "all materials prepared by or for the Council prior to Council meetings," which Plaintiffs contend is required by FACA. Compl. ¶ 92. Yet § 10(b) of FACA does not require dissemination of material *prior* to a meeting, so long as the materials are provided at the meeting itself. *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992) ("In order for 'interested parties to present their views,' and for the public to 'be informed with respect to the subject matter,' it is essential that, whenever practicable, parties have access to the relevant materials *before or at* the meeting at which the materials are used and discussed." (emphasis added)). To be sure, the standard articulated by the D.C. Circuit in *Food Chem. News* is based on the principle that "[o]pening the meetings to the public would be meaningless if the public could not follow the substance of the discussions." *Id.* There may be instances in which certain particularly voluminous or technical documents would need to be provided prior to hearings to allow the public a genuine chance to follow the discussion. Here, however, Plaintiffs have not alleged that failure to disseminate the relevant documents prior to the meetings prevented them or anyone from following the substance of the discussions. Pl. Opp. at 34 (citing Compl. ¶¶ 42, 93, 104 and Cummings Decl. ¶¶ 28-31).

Accordingly, as to materials that Defendants presented at the public meetings but not before, the Court concludes that Plaintiffs have failed to state claim.

### c. Subcommittees

Finally, Plaintiffs allege that IWCC subcommittees have already begun to meet, but the Council "has not announced those meetings to the public, provided any relevant documents to the public, or allowed public attendance." Compl. ¶ 92. Defendants do not challenge the sufficiency of Plaintiffs allegations, but instead argue only that FACA's meeting and records requirements do not apply to subcommittees. For the reasons below, the Court concludes that FACA's requirements apply to the IWCC's subcommittees.

FACA defines "advisory committee" as "any committee, . . . or *any subcommittee or other subgroup thereof* . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations." 5 U.S.C. App. II § 3(2) (emphasis added). The plain text of the statute indicates that unless otherwise stated, the same rules apply to committees as to subcommittees. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–20 (2008) (use of the "the expansive word 'any' and the absence of restrictive language [leaves] no basis in the text for limiting the phrase" in question (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). The relevant GSA regulations carve out a limited exception for "subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency," to which FACA and its implementing regulations would not apply. 41 C.F.R. § 102-3.35. However, this regulation "does not preclude an agency from applying any provision of [FACA] and [its implementing regulations] to any subcommittee of an advisory committee in any particular instance." *Id.* In other words, there is an exception to § 102-3.35 that is triggered if an agency determines that provisions of FACA apply to its subcommittees. The question is therefore whether IWCC subcommittees fall within this exception to § 102-3.35.

The Court concludes that they do.  As an initial matter, it is not altogether clear that § 102-3.35 is consistent with the expansive text of FACA, which would seem to preclude regulatory exceptions. *See, e.g., Ali*, 552 U.S. at 218–20.  However, the Court need not determine whether § 102-3.35 is consistent with FACA in general, since the IWCC subcommittees fall under the exception to § 102-3.35.  According to Plaintiffs' Complaint, the Department of Interior's Manual extends FACA's requirements to the IWCC's subcommittees. Compl. ¶ 41; *see also* Dkt. No. 45 ("[The Department of the Interior] has chosen to apply FACA to all subcommittees of advisory committees, [its manual] explicitly providing that '[t]he provisions of [FACA] and this chapter are applicable to subcommittees and subgroups of advisory committees established or utilized by the Department." (quoting Department of the Interior's manual).[2]  Furthermore, the Department of Interior has directed that its "[b]ureaus and offices *must* comply" with the Manual. 011 DM 1.2(B) (emphasis added).  Accordingly, the Department of Interior has decided to "apply[] a[] provision of [FACA] and [the GSA's implementing regulations] to a[] subcommittee," triggering the exception to § 102-3.35.  And even assuming that the Interior Manual itself does not have force of law, because the IWCC subcommittees do not fall under § 102-3.35, they are subject to FACA's requirements, which no one disputes are binding.  Finally, the Court notes that the only case of which it is aware that has addressed this issue directly reached the same conclusion. *See W. Org. of Res. Councils v. Bernhardt*, 362 F. Supp. 3d 900, 914 (D. Mont. 2019).  The Court therefore concludes that FACA applies to the IWCC subcommittees.

---

[2] Though this language is not present in Plaintiffs' complaint, it is included in a later filing, and Defendants do not challenge its veracity or the ability of this Court to rely on it.

Accordingly, Defendants' motion to dismiss Count Two is GRANTED as to Plaintiffs claim that Defendants violated FACA by failing to produce documents prior to public meetings and otherwise DENIED.

### C.  Defendants' Motion to Dismiss Count Three is Denied in its Entirety

Count Three alleges that the membership of the IWCC lacks sufficient balance, in violation of FACA.  Compl. ¶¶ 106-09.  Under FACA, "the membership of [an] advisory committee [must] be fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. II § 5(b)(2).  Plaintiffs allege that, *inter alia,* while the IWCC was chartered to "provide advice and recommendations . . . focused on increased public awareness domestically regarding the conservation . . . benefits that result from United States citizens traveling to foreign nations to engage in hunting[,]" no scientists, economists, or experts in wildlife conservation are represented.  Compl. ¶ 107 (internal quotation marks omitted).  As result, Plaintiffs contend that the Council violates § 5(b)(2).  Defendants have moved to dismiss on the grounds that Plaintiffs lack standing and that § 5(b)(2) is not justiciable. The Court addresses each argument in turn.

### 1.  Plaintiffs Have Sufficiently Alleged Standing Based on Denial of Representation and Diversion of Resources

Plaintiffs advance two theories of standing as to Count Three.  First, that because Plaintiffs "sought and were denied a seat on the Council," they have suffered an injury in fact. Pl. Opp. at 17-18.  Second, Plaintiffs allege that the lack of balance on the Council compounds the difficulty of obtaining information on IWCC activities, causing them to divert further resources to monitoring the Council.  For the reasons given below, the Court concludes that Plaintiffs have sufficiently alleged both forms of standing.

Denial of access to representation on an advisory committee can constitute an injury in fact under FACA. While the Second Circuit has not weighed in on this issue, the weight of the caselaw in other circuits indicates that if a party with a direct interest in the committee's work applies for membership and is denied access, that party has standing to challenge the denial. *See Physician's Ed. Network, Inc. v. Dep't of Health, Ed. & Welfare*, 653 F.2d 621, 623 (D.C. Cir. 1981) (per curiam) (citing cases in which such allegations were sufficient for standing); *Washington Legal Found. v. Am. Bar Ass'n Standing Comm. on Fed. Judiciary*, 648 F. Supp. 1353, 1357-58 (D.D.C. 1986) (finding standing in such circumstances); *Ctr. for Policy Analysis on Trade & Health v. Office of United States Trade Representative*, No. C05-05177 MJJ, 2006 WL 8446407, at *3 (N.D. Cal. June 29, 2006) *aff'd sub. nom. Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*, 540 F.3d 940, 943 n.2 (9th Cir. 2008), *as amended* (Oct. 8, 2008) (finding standing in such circumstances and noting that most courts who have considered the issue have found the same) (citing cases); *see also Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983) (stating, in dicta, that standing would exist in such circumstances). Defendants contend that because no one is *entitled* to a seat on the Council, denial of an appointment is not an injury. Def. Rep. at 3-4. Yet as alleged, the harm arises not because a given individual is entitled to a seat on an advisory committee, but rather because she is entitled to a fair adjudication of her application for membership. *Id.* Thus, this Court agrees with the other courts to have considered this question that denial of membership on an advisory committee is a sufficiently concrete harm to constitute an injury in fact.

Under this standard, Plaintiffs have sufficiently alleged an injury in fact. Plaintiffs "jointly nominated" the Deputy Chief Program Officer of NRDC, Andrew Wetzler. Compl. ¶ 75;

Cummings Decl. ¶¶ 18-19.  Plaintiffs allege that Mr. Wetzler has significant expertise in relevant areas and was eminently qualified for the position.  Compl. ¶ 75; Cummings Decl. ¶ 18.  Yet "without explanation to Mr. Wetzler or the public," Defendants allegedly rejected not just Mr. Wetzler's nomination, but all nominations to the IWCC from any individuals who did not share a pro-trophy hunting viewpoint.  Compl. ¶¶ 75-79; Cummings Decl. ¶ 18.  Drawing all reasonable inferences in Plaintiffs' favor, they have sufficiently alleged that Defendants did not grant Mr. Wetzler an unbiased adjudication of his application for membership on the Council.

Independently, the Court finds that Plaintiffs have sufficiently alleged an organizational harm based on diversion of resources.  As the Court found above, Defendants' alleged lack of transparency has required Plaintiffs to divert their resources to monitoring the Council.  Plaintiffs further allege that their lack of representation on the Council has further contributed to their monitoring costs.  Compl. ¶¶ 26-28, 30; Cummings Decl. ¶ 26.  It is a reasonable inference from Plaintiffs' allegations that representation on the Council would improve their ability to keep abreast of the Council's activities and increase access to information and documents relating to the Council's work.  Thus, for similar reasons to Counts 1 and 2, Plaintiffs have sufficiently alleged that Defendants' denial of Plaintiffs' nominees for the Council has caused a diversion of resources.

Finally, Defendants' argument that these harms are not redressable is unavailing.  As an initial matter, this argument is essentially a reformulation of Defendants' contention that there are no justiciable standards to apply, and accordingly is properly addressed in the justiciability analysis below.  *See infra* Section III(C)(2).  And as to the redressability specifically, at least one court has ordered that violations of FACA's fair balance requirement be remedied by "good faith effort[s]" to appoint a "properly qualified . . . representative" from the excluded viewpoints.  *See*

25

*Nw. Ecosystem All. v. Office of the U.S. Trade Representative*, No. C99-1165R, 1999 WL 33526001, at *8 (W.D. Wash. Nov. 9, 1999).  Defendants offer no reason why the Court could not fashion a similar remedy here.

For the above reasons, Plaintiffs have sufficiently alleged standing on Count Three.

### 2.    FACA's Fairly Balanced Requirement Is Justiciable

The Court now turns to Defendants' argument that Count Three is non-justiciable. Defendants argue that that the makeup of an advisory committee is committed to agency discretion, as Congress has not provided courts with meaningful standards to apply.  Def. Br. 22-27.  There is currently a split among circuits as to whether § 5(b)(2) is justiciable and the Second Circuit has yet to weigh in.  For the reasons given below, the Court concludes that there is sufficient law to apply for the Court to review whether a committee complies with § 5(b)(2).

### a.   The Text §5(b) of FACA Indicates an Absence of Discretion and Some Standards for Judicial Review

The justiciability analysis starts with the text of the statute.  *See Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016).  Under FACA, the relevant entity that establishes an advisory committee "shall . . . require" that the membership of the committee be "fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. II § 5(b)(2), (c).  The Court's analysis thus begins with the terms that Congress employed.

First, the use of the mandatory term "shall" points to an absence of discretion. As the Supreme Court has indicated, "Congress' use of the term 'shall' indicates an intent to 'impose discretionless obligations.'"  *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 400 (2008) (quoting *Lopez v. Davis*, 531 U.S. 230, 241 (2001)); *see also Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015) ("the word 'shall' admits of no discretion").  Such a mandatory directive is not committed to agency discretion.

26

Second, the definitions of "fair" and "balanced" indicate judicially manageable standards, at least in extreme cases. *See Mach Mining*, 135 S. Ct. at 1652 (looking to dictionary definition to determine that the term "endeavor" provided a justiciable standard). While it is true that "fairly balanced" is broad, these terms are also not so vague as to provide no guidance at all. *See Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 423 (D.C. Cir. 1989) (per curiam) (Edwards, J., concurring) ("[i]t does not matter that the 'fairly balanced' requirement falls short of mathematical precision in application, or that it may involve some balancing of interests by the agency. The presumption in favor of judicial review is not altered in the face of a diffuse statutory directive."). While fairness is a capacious concept, it is defined as "[c]haracterized by honesty, impartiality . . . equitable" and "[f]ree of bias or prejudice." "Fair," Black's Law Dictionary (11th ed. 2019). The meaning of balance provides more concrete guidance still, as its relevant definitions are "[t]o equalize in number, force, or effect, to bring into proportion" and "[t]o measure competing interests and offset them appropriately." "Balance," Black's Law Dictionary (11th ed. 2019). The statute goes on to describe the kind of proportionality or offsetting of competing interests that is required, which is balance "in terms of points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. App. II § 5(b)(2).

At the very least, this language would provide a standard for a reviewing court to determine whether there had been a deliberate and explicit effort to avoid the representation of any competing viewpoints on the subject matter of an advisory committee. For example, it would clearly violate the "fairly balanced" requirement if the Secretary were to announce that he would exclude all points of view except one. Such examples are important, since even if a statute provides judicially manageable standards in extreme cases, it is justiciable. *Mach Mining*,

135 S. Ct. at 1652 (holding that the word "endeavor" provides a justiciable standard partly because it could be enforced in a case where the agency did not make any effort at all).   Thus, while admittedly broad, the language of § 5(b)(2) does provide a reviewing court with certain standards to apply, even if only in more extreme cases.

### b.  Congress Enacted FACA and § 5(b)(2) to Place Limits on Agency Discretion

An examination of Congress' purpose in enacting FACA supports this conclusion.  *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (analyzing the language, structure, and legislative history of a statute to determine whether an action was committed to agency discretion by law). Congress enacted FACA because it concluded that "standards and uniform procedures should govern the establishment, operation, administration, and duration of advisory committees." 5 U.S.C. App. II § 2(b) (findings and purpose of FACA).  When Congress enacted FACA, its "principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." *Public Citizen v. Department of Justice*, 491 U.S. 440, 459 (1989).  This is therefore not a statute that "fairly exudes deference" to the agency. *Webster*, 486 U.S. at 600.  Nor is it one where it is clear that Congress "wanted an agency to police its own conduct." *Mach Mining*, 135 S. Ct. at 1651.  To the contrary, FACA sought to reign in and introduce needed oversight over a sprawling, opaque, and generally poorly regulated process.

This broader purpose is expressed in the provisions of § 5, which were "designed to counter 'the belief that these [advisory] committees do not adequately and fairly represent the public interest [or] that they may be biased toward one point of view or interest.'" *Microbiological Criteria*, 886 F.2d at 423 (Edwards, J., concurring) (quoting S. Rep. No. 1098, 92d Cong., 2d Sess. 4–5 (1972)).  Thus, the "fairly balanced" requirement was "designed to

ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee." *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1074, n.2 (D.C. Cir. 1983) (citing S. REP. NO. 1098, 92d Cong., 2d Sess. 9 (1972); H.R. REP. NO. 1017). In light of the broader purpose of FACA and the specific purpose of § 5(b), it is implausible to conclude that Congress simultaneously passed a law designed to constrain executive discretion and ensure Executive Branch accountability, while also wholly precluding judicial review of advisory committee design decisions by federal agencies. Accordingly, Congress' purpose in enacting FACA and § 5(b) weighs in favor of justiciability.

### c. The Relevant Regulations and Guidelines Provide Further Direction as to How Courts Shall Apply § 5(B)

The Court need not rely on § 5(b)'s language and purpose alone in determining that there is sufficient law to apply, since the relevant regulations and guidance provide even more concrete direction still for judicial review. It is well-settled that an "agency's regulations" and "informal agency guidance" can also provide "law to apply." *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (even if the statute leaves "the agency's discretion . . . unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed," there can be sufficient standards for judicial review); *see also Salazar*, 822 F.3d at 80. Here, GSA regulations and agency manuals provide further law for a reviewing court to apply.

The relevant GSA regulations go into greater detail on what constitutes a fairly balanced committee under § 5(b). Under these regulations, before establishing a new committee, an agency head must consult with the Secretariat at GSA. 41 C.F.R. § 102-3.60. As a part of that consultation, the agency head must provide "[a] description of the agency's plan to attain fairly

29

balanced membership." *Id.* § 102-3.60(b)(3).   This is to ensure that "the agency will consider a

cross-section of those directly affected, interested, and qualified, as appropriate to the nature and

functions of the advisory committee." *Id.*  In addition,  "[a]dvisory committees requiring

technical expertise should include persons with demonstrated professional or personal

qualifications and experience relevant to the functions and tasks to be performed." *Id.*  Finally,

the regulations also contain an appendix that "identifies key points and principles that may be

applied to situations not covered elsewhere . . . ." 41 C.F.R. § 102-3, Subpt. B, App. A.  The

appendix offers the following factors as relevant to whether a committee is fairly balanced,

including: "(i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic,

or scientific impact of the advisory committee's recommendations; (iii) The types of specific

perspectives required, for example, such as those of consumers, technical experts, the public at-

large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on

the issues before the advisory committee; and (v) The relevance of State, local, or tribal

governments to the development of the advisory committee's recommendations." *Id.*  These

regulations provide further factors for a court to look into in determining whether an advisory

committee is fairly balanced.

The relevant agency manuals also provide other factors that may guide judicial analysis.

IWCC is administered by Fish and Wildlife.  *See* Charter; 82 Fed. Reg. 51,857, 51,857 (Nov. 8,

2017).  Fish and Wildlife has promulgated a Service Manual (the "Fish and Wildlife Manual")

which provides additional relevant considerations, such as that "[d]epending on the committee's

functions, we should select members to represent a variety of economic and social groups and

geographic areas." 107 FW 4.7(B)(2).  The Department of Interior as a whole also has a manual

that contains nearly identical provisions.  *See* 308 DM 8.3(A).  Defendants counter that the Court

cannot consider the Fish and Wildlife manual because, unlike the GSA regulations, it does not have force of law. However, even "informal agency guidance . . . can provide a court with law to apply." *Salazar*, 822 F.3d at 76. This is because, especially "where the rights of individuals are affected, it is incumbent upon the agencies to follow their own procedures." *Id.* (quoting *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir.1991)). Therefore, even if these agency manuals do not have the force of law, it can provide the Court with "law to apply" in the context of the justiciability analysis.

### d. There Is Law to Apply

In light of FACA's text and purpose, the applicable GSA regulations, as well as the Interior and Fish and Wildlife manuals, the Court concludes that Defendants have not carried their "heavy burden" of showing that "Congress prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach Mining*, 135 S. Ct. at 1651 (internal quotation marks and brackets omitted). As to the scope of review itself, the language and purpose of the statute indicate that, at a minimum, evidence that certain viewpoints were automatically excluded on that basis alone would violate § 5(b)(2). Furthermore, the statutory language, the GSA regulations, and informal agency guidance support the Fifth Circuit's conclusion that the relevant inquiry involves looking to its mission and "the functions to be performed." *Cargill, Inc. v. United States*, 173 F.3d 323, 335-36 (5th Cir. 1999); *see also Microbiological Criteria*, 886 F.2d at 423 (Friedman, J., concurring).

The presence of agency regulations and guidance also distinguishes this case from the Ninth Circuit's finding that § 5(b)(2) was not reviewable in the context of a trade advisory committee. *See Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*, 540 F.3d 940, 947 (9th Cir. 2008). Indeed, the Ninth Circuit cabined its "narrow" opinion to the case before it, stating "we do not suggest that FACA's 'fairly balanced'

31

requirement is non-reviewable in every circumstance.  It remains an open question in this circuit

whether FACA's 'fairly balanced' requirement presents a reviewable controversy in other

circumstances." *Id.*  Similarly, Judge Silberman's concurring opinion in *Microbiological*

*Criteria*, on which Defendants rely heavily, did not involve regulations and guidance of the kind

present here.  886 F.2d 419, 426-30 (D.C. Cir. 1989) (Silberman, J., concurring).  For these

reasons, the Court concludes that § 5(b)(2) is justiciable.

The Court emphasizes, however, that just because a statute is justiciable does not mean

that the agency is stripped of discretion.  Indeed, a statute may be justiciable and still provide the

agency with "wide latitude."  *Mach Mining*, 135 S. Ct. at 1652; *Microbiological Criteria*, 886

F.2d at 423 (Edwards, J., concurring) ("the difficulty of determining what precisely constitutes a

'fair balance' may incline courts to be deferential in reviewing the composition of advisory

committees").  The degree of discretion a statute allows "becomes significant when" the Court

turns "to defining the proper scope of judicial review."  *Mach Mining*, 135 S. Ct. at 1652.

However, as Defendants did not move to dismiss Count Three for failure to state a claim, the

Court does not need to address the precise application of this standard to the merits of Plaintiffs'

claims at this stage.

Accordingly, Defendants' motion to dismiss Count Three is DENIED in its entirety.

### D.      Defendants' Motion to Dismiss Count Four is Denied in its Entirety

Turning now to Plaintiffs' final claim, Count Four alleges that the IWCC has failed to

include provisions in its charter to protect the independence of the committee from inappropriate

influence.  *See* Compl. ¶¶ 110-12.  Under FACA, the creation of an advisory committee must

include establishing provisions to guard against special interest influence.  5 U.S.C. App. II

§ 5(b)(3).  Plaintiffs allege that the IWCC lacks such provisions.  Compl. ¶ 111.  Defendants

move to dismiss this Count on the grounds that Plaintiffs lack standing and that § 5(b)(3) is non-justiciable.

### 1.   Plaintiffs Have Sufficiently Alleged Organizational Standing

As to this Count, Plaintiffs argue they possess organizational standing based on the same diversion-of-resources theory described above.  The link between the alleged violations of § 5(b)(3) and increased monitoring costs is more attenuated than with Counts 1 and 3. Nonetheless, at this stage, drawing all reasonable inferences in Plaintiffs' favor, they have plausibly alleged that the absence of sufficient safeguards against influence by special interests has led to increased monitoring costs.  Specifically, Plaintiffs allege that the lack of such safeguards has allowed the Council to be comprised almost entirely of members who are directly involved with import/export permitting of protected species. *See* Compl. ¶ 111.  The risk of bias, including potentially undisclosed bias, compounded by the alleged general lack of transparency, has led Plaintiffs to prioritize monitoring the IWCC over other forms of conservation work. Cummings Decl. ¶¶ 21-23, 25-26, 33.  Accordingly, while this is a closer question, drawing all reasonable inferences in Plaintiffs' favor, they have sufficiently alleged standing at this stage of the litigation.

### 2.   FACA's Special Interest Provision Is Justiciable

As to Defendants' justiciability arguments, this Circuit has not yet determined whether § 5(b)(3) of FACA is justiciable.  For the following reasons, the Court concludes that it is.

As above, the Court begins with the text. *See Salazar*, 822 F.3d at 76.  Under § 5(b)(3), when agency head establishes an advisory committee, she "shall" ensure that the advisory committee's charter "contain[s] appropriate provisions" to protect against "inappropriate[] influence[] by the appointing authority or by any special interest."  5 U.S.C. App. II § 5(b)(3), (c).  It is true that the terms "appropriate provisions," "special interests" and "inappropriate

influence" are quite broad. And the statute does little to explain how these standards should be applied. Yet, as with § 5(b)(3), the use of "shall" indicates justiciability. *See Fed. Exp. Corp.*, 552 U.S. at 400. And while what constitutes an "appropriate" provision is left vague, the mandatory "shall . . . contain appropriate provisions" indicates that a court could review whether agency had established *any* provisions relating to the decisional independence of an advisory committee. 5 U.S.C. App. II § 5(b)(3). This case is therefore analogous to *Mach Mining*, in which the Supreme Court concluded that even though a provision requiring that an agency "endeavor" to accomplish a task was vague and offered the agency wide latitude, it was justiciable in instances in which the agency clearly did not even take any steps at all to accomplish that task. 135 S. Ct. at 1652. Furthermore, as described above, the purpose of FACA generally and of the provisions of § 5(b) specifically further supports the conclusion that Congress did not intend to "prohibit[] all judicial review of the agency's compliance with a legislative mandate." *Id.* at 1651 (internal quotation marks omitted). As with § 5(b)(2) above, while § 5(b)(3) may only provide standards for a court to apply in extreme cases, this is sufficient to render the provision justiciable.

For similar reasons, the Court is not persuaded by the cases from other circuits that Defendants cite, all of which focus on the difficulty of defining "appropriate" and "special interests." *See Colorado Environmental Coalition v. Wenker,* 353 F.3d 1221, 1231 (10th Cir. 2004) ("[t]he problem we have with this claim centers on the word 'inappropriate'"); *Microbiological*, 886 F.2d at 430 (Silverman, J., concurring) (stating that §5(b)(3) is not justiciable because it is "dependent on the meaning of a value-laden, undefinable term"). These decisions pre-date the Supreme Court's 2015 decision in *Mach Mining*, and do not sufficiently grapple with the fact that "shall . . . contain . . . provisions" can provide a standard for a court to

34

apply, even if only in cases where no such provisions are established at all. Finally, as with Count Three, because Defendants have not moved to dismiss Count Four for failure to state a claim, the Court finds it unnecessary to determine whether the existing provisions in the IWCC charter satisfy § 5(b)(3).

Accordingly, the Court concludes that § 5(b)(3) is justiciable. Defendants' motion to dismiss Count Four is accordingly DENIED in its entirety.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion as to Counts One, Three, and Four are DENIED in the entirety. Defendants' motion as to Count Two is GRANTED in part as to Plaintiff's claim that FACA required Defendants to produce materials prior to meetings, Defendants' motion as to Count Two is otherwise DENIED. This resolves Docket Number 40. The Court will schedule an initial pretrial conference by separate order.

SO ORDERED.

Dated: September ___, 2019
       New York, New York

_____
ALISON J. NATHAN
United States District Judge