# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

NATURAL RESOURCES DEFENSE COUNCIL,
CENTER FOR BIOLOGICAL DIVERSITY,
HUMANE SOCIETY INTERNATIONAL, *and*
HUMANE SOCIETY OF THE UNITED STATES,

          *Plaintiffs*,

          vs.

DAVID BERNHARDT, in his official capacity as
Secretary of the Interior, DEPARTMENT OF THE
INTERIOR, AURELIA SKIPWITH, in her official
capacity as Director of the U.S. Fish and Wildlife
Service, *and* U.S. FISH AND WILDLIFE SERVICE,

          *Defendants*.

Case No. 18-CV-6903 (AJN)

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

/s/ Travis J. Annatoyn
Jeffrey B. Dubner
Travis J. Annatoyn
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 601-2483
jdubner@democracyforward.org
tannatoyn@democracyforward.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

LEGAL BACKGROUND ......................................................................................................3

   I.   The Federal Advisory Committee Act. ....................................................................... 3

      A.   Establishment of advisory committees under FACA Section 9......................... 3

      B.   Balanced and fair committee membership under FACA Section 5.................... 5

      C.   Open meetings and records under FACA Section 10. ...................................... 5

FACTUAL AND PROCEDURAL BACKGROUND ..............................................................6

STANDARD OF REVIEW ...................................................................................................10

ARGUMENT ........................................................................................................................10

   I.   The Council Is Unlawful. ....................................................................................... 11

      A.   The Council Is Unlawfully Established......................................................... 11

      B.   The Council Is Not Fairly Balanced............................................................. 14

      C.   Defendants Did Not Institute Appropriate Safeguards Against Special Interests. ........... 15

      D.   Defendants Unlawfully Shielded The Council From Public Oversight............................ 17

   II.   The Court Should Order Defendants To Release All Council Records And Enjoin The Department From Relying On The IWCC's Work Product. ................................................. 18

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo-Nobel, Inc. v. United States,*
   No. 00-30834, 2001 WL 34772206 (5th Cir. May 25, 2001) ............................................... 20

*Alabama-Tombigbee Rivers Coal. v. Dep't of Interior,*
   26 F.3d 1103 (11th Cir. 1994) ................................................................................. 19

*Amerijet Int'l, Inc. v. Pistole,*
   753 F.3d 1343 (D.C. Cir. 2014) ................................................................................ 13

*Cal. Forestry Ass'n v. U.S. Forest Serv.,*
   102 F.3d 609 (D.C. Cir. 1996) ............................................................................. 19, 20

*Cargill, Inc. v. United States,*
   173 F.3d 323 (5th Cir. 1999) ............................................................................. 15, 16, 19

*Conservation Force v. Salazar,*
   677 F. Supp. 2d 1203 (N.D. Cal. 2009) ........................................................................ 9

*Consumers Union of U.S. v. Dep't of Health, Educ. & Welfare,*
   409 F. Supp. 473 (D.D.C. 1976) ................................................................................ 4

*Cummock v. Gore,*
   180 F.3d 282 (D.C. Cir. 1999) ............................................................................. 3, 14, 19

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin,*
   733 F.3d 393 (2d Cir. 2013) .................................................................................. 20

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
   805 F.2d 1050 (D.C. Cir. 1986) ............................................................................... 12

*High Sierra Hikers Ass'n v. Blackwell,*
   390 F.3d 630 (9th Cir. 2004) .................................................................................. 11

*J. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.,*
   219 F. Supp. 2d 20 (D.D.C. 2002) ............................................................................. 18

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ......................................................................................... 11

*Montilla v. I.N.S.,*
   926 F.2d 162 (2d Cir. 1991) .................................................................................. 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................................ 10, 13

*Nat. Res. Def. Council v. Dep't of Interior*,
  No. 18-CV-6903 (AJN), 2019 WL 4601722 (S.D.N.Y. Sept. 23, 2019) ................................... *passim*

*Nat. Res. Def. Council v. Pena*,
  147 F.3d 1012 (D.C. Cir. 1998) ........................................................................................... 20

*Nw. Ecosystem All. v. Off. of U.S. Trade Rep.*,
  No. C99-1165R, 1999 WL 33526001 (W.D. Wash. Nov. 9, 1999) ................................... 15, 20

*People for Ethical Treatment of Animals v. Barshefsky*,
  925 F. Supp. 844 (D.D.C. 1996) ............................................................................................. 3

*Pub. Citizen v. DOJ*,
  491 U.S. 440 (1989) ............................................................................................... 3, 14, 18

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
  886 F.2d 419 (D.C. Cir. 1989) ........................................................................................... 15, 16

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013) ......................................................................................... 9

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017) ........................................................................................... 9, 13

*W. Org. of Res. Councils v. Bernhardt*,
  18-CV-139-M-DWM, 2019 WL 3805125 (D. Mont. Aug. 13, 2019) ................................... *passim*

*Wash. Legal Found. v. Am. Bar Ass'n*,
  648 F. Supp. 1353 (D.D.C. 1986) ........................................................................................... 5

*Western Organization of Resource Councils v. Bernhardt*,
  362 F. Supp. 3d 900 (D. Mont. 2019) ................................................................................... 18

**Statutes**

5 U.S.C. App. II

§ 2 .................................................................................................................................. 3

§ 5 ........................................................................................................................... *passim*

§ 9 ........................................................................................................................... *passim*

§ 10 ............................................................................................................................. 5, 6

§ 14 ............................................................................................................................... 10

5 U.S.C. §§ 701-706 ..................................................................................................................... 10

16 U.S.C. § 1539 ........................................................................................................................... 13

**Other Authorities**

41 C.F.R.

    Pt. 102-3, Subpt. B, App. A ................................................................................................ 5, 14

    § 102-3.140 .................................................................................................................................. 6

    § 102-3.35 ...................................................................................................................... 6, 17, 18

    § 102-3.60 ........................................................................................................................ 4, 11, 13

H.R. Rep. No. 92-1017 ............................................................................................................... 15

## INTRODUCTION

Trophy hunters kill animals for the purpose of collecting and displaying their parts.  In recognition of acute threats to international populations of imperiled species (such as lions and elephants), the import and export of these trophies is regulated under laws such as the Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").  A clear majority of Americans support protections for imperiled species and oppose international trophy hunting.  Conversely, restrictions on trophy imports have long agitated the vanishingly small population of wealthy Americans who hunt imperiled species abroad and—due to restrictions under the ESA and CITES—are sometimes unable to return their trophies to the United States.

The Department of the Interior ("Department") is the federal agency responsible for trophy import controls.  In the fall of 2017, then-Secretary of the Interior Ryan Zinke established the "International Wildlife Conservation Council" ("IWCC" or "Council"), an assemblage of trophy hunting advocates who were to advise him on the ways in which hunting and killing imperiled species abroad would "benefit" those species.  But as this "fox and henhouse" dynamic suggests, the Council was unlawful, running afoul of the Federal Advisory Committee Act ("FACA").  That statute embodies Congress' firm conviction that unregulated committees of non-government advisors—occluded from public scrutiny and duplicative of the federal government's own policymaking apparatus—are ripe for manipulation by coordinated special interests and their allies within the executive branch.  To deter and prevent such manipulation, Congress imposed several procedural and substantive requirements on agencies establishing advisory committees, many of which Defendants ignored when designing and maintaining the Council.

*First*, Defendants ignored their obligation to consult—both within the Department and with other components of the executive branch—to ensure that the Council was necessary and fairly-

balanced.  Defendants transmitted an incomplete consultation package to the General Services

Administration ("GSA") (the executive branch agency overseeing FACA compliance) and then

signed the Council's charter only four days later, without waiting for GSA's response.  They

established the Council without even notifying career agency officials responsible for trophy import

policy.  And they did not consider or respond to the 16,819 public comments on the proposed

Council, 99.97 percent of which opposed the committee.

     *Second*, Defendants did not comply with FACA's requirement that advisory committee

membership be "fairly balanced" and controlled for conflicts of interest.  Although the most

numerous and best-substantiated comments on the Council's proposed formation called upon

Defendants to include Council representation from organizations skeptical of trophy hunting's

"benefits" (such as Plaintiffs), Defendants blacklisted those organizations and summarily rejected

Plaintiffs' nominee.  Instead, Defendants stacked the Council with individuals or representatives of

organizations with vested interests in rolling back protections for imperiled species and liberalizing

trophy imports into the United States.

     *Third*, Defendants did not open Council proceedings to the public.  The Council outsourced

much of its work to secretive subcommittees, which operated almost entirely outside of the public

eye.  And, in an egregious violation of FACA's letter and spirit, the Council itself met at least twice

with high-ranking Department officials at the agency's headquarters without notifying the public.

     As the Court has already recognized, these violations injure Plaintiffs by depriving them of

information necessary to their work and by forcing them to expend and divert organizational

resources to monitor Council activities.  The Council's charter appears to have lapsed on December

21, 2019, but Plaintiffs' injuries persist in the form of (1) deprivation of committee materials that

FACA requires Defendants to make public; (2) deprivation of access to committee records reserved

for Council members and; (3) Council work product and recommendations.  This case is therefore

not moot, and the Court should award summary judgment to Plaintiffs and grant appropriate equitable relief, including an order prohibiting Defendants from using or relying on any of the Council's recommendations or work product.

## LEGAL BACKGROUND

### I.   The Federal Advisory Committee Act.

"The Federal Advisory Committee Act . . . was enacted in 1976 with Congress' recognition that many committees, boards, commissions, and other groups provide the executive branch with valuable expert advice, ideas and opinions." *People for Ethical Treatment of Animals v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996). "However, Congress was also cognizant of the fact that many advisory committees were created without adequate justification," *id.*, a failing that had accelerated the creation of new committees, diluted public and congressional oversight of those committees, and positioned special interests to surreptitiously direct federal policymaking. FACA was designed to arrest these trends and "cure . . . the wasteful expenditure of public funds for worthless committee meetings and biased proposals." *Pub. Citizen v. DOJ*, 491 U.S. 440, 453 (1989). *See also Cummock v. Gore,* 180 F.3d 282, 284 (D.C. Cir. 1999) ("Congress . . . feared the proliferation of costly committees . . . dominated by representatives of industry and other special interests seeking to advance their own agendas."). As relevant here, FACA meets these goals by (1) erecting meaningful barriers to the creation of new advisory committees; (2) policing the membership of advisory committees for balance and conflicts of interest, and; (3) opening committee proceedings and records to the public.

### A.  Establishment of advisory committees under FACA Section 9.

FACA reflects Congress' judgment that "new advisory committees should be established only when they are determined to be essential and their number should be kept to the minimum necessary." 5 U.S.C. App. II § 2(b)(2). FACA Section 9 therefore discourages "useless" or "self-

serving" advisory committees by requiring that federal agencies justify new committees to Congress, the public, and the GSA, which issues FACA's implementing regulations and tracks advisory committees across the executive branch. *Consumers Union of U.S. v. Dep't of Health, Educ. & Welfare*, 409 F. Supp. 473, 475 (D.D.C. 1976).

Specifically, an agency proposing a new committee "*must* consult" with GSA "*[b]efore* establishing" the committee, so that GSA can "suggest alternate methods of attaining its purpose . . . , or inform the agency of a pre-existing advisory committee performing similar functions." 41 C.F.R. § 102-3.60(a) (emphasis added). *See also* 5 U.S.C. App. II § 9 (a)(2) (establishment of committee may only proceed "after" consultation). "Consultations . . . *must*, as a minimum, contain the following information:

> (1) Explanation of need.  An explanation stating why the advisory committee is essential to the conduct of agency business and in the public interest;
>
> (2) Lack of duplication of resources.  An explanation stating why the advisory committee's functions cannot be performed by the agency, another existing committee, or other means such as a public hearing; and
>
> (3) Fairly balanced membership.  A description of the agency's plan to attain fairly balanced membership.  The plan will ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee."

41 C.F.R. § 102-3.60(b) (emphasis added).

During the IWCC's formation and for most of its existence, the Department of Interior Manual imposed additional hurdles to committee formation.[1]  The Manual required that proposals for new committees be memorialized in a memorandum to the Secretary of Interior, which was to document the need and justification for the proposed committee in ways similar to the GSA requirements set forth above.  308 DM § 2.6.  *See* Ex. A.

---

[1] Without notice or explanation, the Department abruptly rescinded this Chapter of the Manual soon after the District of Montana held that the Manual's provisions were enforceable.  *See W. Org. of Res. Councils v. Bernhardt*, 18-CV-139-M-DWM, 2019 WL 3805125, at *5 (D. Mont. Aug. 13, 2019).

4

Upon conclusion of these consultations and consideration of the issues raised therein, a federal agency interested in establishing an advisory committee must "determine[] as a matter of formal record . . . with timely notice published in the Federal Register, [that the committee is] in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. II § 9(a)(2).

### B.   Balanced and fair committee membership under FACA Section 5.

Congress also requires each advisory committee to reflect a diversity of interests.  "[T]he membership of [an] advisory committee [must] be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. II § 5(b)(2), (c).  GSA has specified the relevant factors for membership balance as:

> (i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical experts, the public at-large, academia, business, or other sectors; (iv) *The need to obtain divergent points of view on the issues before the advisory committee*; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations.

41 C.F.R. Pt. 102-3, Subpt. B, App. A (emphasis added).

Moreover, each advisory committee must minimize the possibility of inappropriate influence by special interests: the committee's charter must "contain . . . provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]"  5 U.S.C. App. II § 5(b)(3), (c).

### C.   Open meetings and records under FACA Section 10.

Finally, FACA aims to control the advisory committee process by "open[ing] to public scrutiny the manner in which government agencies obtain advice from private individuals and groups."  *Wash. Legal Found. v. Am. Bar Ass'n*, 648 F. Supp. 1353, 1358 (D.D.C. 1986) (quotation omitted).  Thus, the committee must provide "timely notice" of its meetings to the public, 5 U.S.C.

App. II § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with [the] committee," *id.* § 10(a)(3).  All meetings must be held "in a manner or place reasonably accessible to the public" and permit "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit[.]"  41 C.F.R. § 102-3.140(a), (d).  Finally, every advisory committee must publicize "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the committee, 5 U.S.C. App. II § 10(b).

"In general," GSA regulations exempt committee subgroups from the transparency requirements of FACA Section 10.  41 C.F.R. § 102-3.35(a).  However, the regulations also contain an "exception . . . that is triggered if an agency determines that provisions of FACA apply to its subcommittees."  *Nat. Res. Def. Council* ("*NRDC*") *v. Dep't of Interior*, No. 18-CV-6903 (AJN), 2019 WL 4601722, at *10 (S.D.N.Y. Sept. 23, 2019) (citing 41 C.F.R. § 102-3.35(a)).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs have previously detailed the history of the federal government's role in international wildlife conservation and the threats to biodiversity from international trophy hunting.  *See* ECF No. 1 ¶¶ 43-65; ECF No. 45 at 5-7.  Here we summarize the administrative record as applied to Plaintiffs' claims for relief, particularly Defendants' creation of the IWCC, appointment of Council members, and compliance with FACA's open records requirements.

The story of the IWCC's chartering is a short one, since Defendants systematically blew through FACA's procedural safeguards to formalize a committee whose existence and membership were considered *faits accomplis*.  Sometime in October of 2017, Defendants decided to establish a federal advisory committee to consider the "benefits" of international trophy hunting.  The first record of this decision is dated October 30, 2017, when Defendants sent GSA the Council's draft charter and a membership balance plan.  AR:0003.  The record contains no indication that

6

Defendants sent GSA the Council's (undated) "justification statement," which purported to explain why the Council was essential and would not duplicate agency resources. AR:0011. Nor is there any indication that Defendants complied with the Department Manual by preparing the requisite Secretarial memorandum.

Defendants' consultation package is surprising not only because it is incomplete, but also because it was sent at all: the record shows that Defendants had decided to establish the Council *regardless* of GSA's feedback or any other deliberative processes. On November 3, 2017—only four days after Defendants corresponded with GSA and before that agency responded to Defendants' transmission—Secretary Zinke signed the Council's charter.[2] AR:0018-21. Five days later, on November 8, 2017, Defendants published a notice in the Federal Register announcing the Council's formation and opening a thirty-day window for nominations to Council membership. AR:0001-0002. According to the notice, the new advisory committee would "provide advice . . . on increasing public awareness domestically regarding the conservation, wildlife law enforcement, and economic benefits that result from U.S. citizens traveling to foreign nations to engage in hunting." AR:0001. The Council was to comprise representatives of: "[w]ildlife and habitat conservation/management organizations; U.S. hunters actively engaged in international and/or domestic hunting conservation, [t]he firearms or ammunition manufacturing industry; [a]rchery and/or hunting sports industry . . . ; and [t]ourism, outfitter, and/or guide industries related to international hunting." AR:0002.

The announcement of the advisory committee took career officials at the Department of the Interior by surprise. The Director of the Fish and Wildlife Service's Division of Management Authority—the very office overseeing policy and permitting for international trophy hunting—

---

[2] GSA would ultimately provide feedback on the draft charter in early December of 2017—including by reminding Defendants to appoint the Council's members with an eye towards their "expected . . . bias[es]"—but Defendants had already acted. AR:0016.

evidently was not consulted about the Council and learned of its creation second-hand on November 6, 2017.  *See* Ex. B.[3]  The public was likewise taken aback: Defendants received 16,819 responses to the Council's announcement, only *five* of which supported the Council's formation.  *See* Ex. C at 2.  The remainder criticized the committee on various grounds, particularly Defendants' reluctance to allocate Council seats to conservation interests who oppose or have conservation-based concerns regarding international trophy hunting.  *See, e.g.* Ex. D (sample letter criticizing Council).

Among the responses to the Department's notice were two substantive letters (including voluminous attachments) from Plaintiffs.  On November 24, 2017, Plaintiffs wrote to oppose the Council's formation on the grounds that (1) the Council was redundant given preexisting federal advisory committees; (2) international trophy hunting undermines conservation of imperiled species, and; (3) the Council as designed did nothing to prevent conflicts of interests from members with a direct interest in the subject of the Council's work.  *See* Ex. E.  On December 8, 2017, Plaintiffs reiterated these concerns and nominated Andrew Wetzler—an expert in ESA implementation, CITES, and wildlife trade matters—to represent "[w]ildlife and habitat conservation/management organizations" on the Council.  *See* Ex. F.  Mr. Wetzler was more than qualified for Council membership, having worked on wildlife and marine mammal issues at Plaintiff Natural Resources Defense Council for over twenty years, including as Director of the organization's Wildlife Conservation Project.  *See* Ex. G.

The record shows that career officials at the Department dutifully relayed the breadth and substance of public concerns to agency leadership, but to no avail: in direct contravention of the

---

[3] The administrative record incorporates Defendants' responses to Freedom of Information Act requests, available at https://www.fws.gov/irm/bpim/foiaiwcc.html, that are not consecutively paginated.  *See* ECF No. 69-2 at 1.  Where Plaintiffs have relied on these materials, they have attached them as exhibits to this memorandum.

public's interest in the Council, Secretary Zinke stacked the body with representatives of a select

group of pro-trophy hunting lobbying organizations.  *See* Ex. C.  Ten of the Council's sixteen

members are tied to Safari Club International or Conservation Force, organizations that have

lobbied for years to roll back protections for imperiled species and liberalize trophy imports under

the ESA and CITES.[4]  AR:0032-34.  Six members of the Council have connections to firearm

manufacturers or the National Rifle Association, notwithstanding that organization's (at best)

tenuous connection to international wildlife conservation.  *Id.*  The Council does not include a single

expert in global wildlife and habitat conservation, international trade, or foreign aid.  Indeed,

Defendants were so opposed to adding such a member that they evidently rejected Mr. Wetzler's

applications out of hand, declining to place him on the list of nominees for *consideration*.  AR:0029-

30.

      Once established, the Council declined to open its meetings and records as required by

FACA Section 10 and other sources of law.  Defendants have never disputed that they closed the

Council's subcommittee meetings, and the record contains no materials to the contrary.  The record

does, however, establish that the full Council met at least twice before its first publicized gathering.

On March 15, 2018, the Council met for roughly three hours with Secretary Zinke and "DOI

leadership" in the Secretary's office.  AR:0328.  The next morning, the Council met for about an

hour with then-Deputy Secretary (now Secretary) of the Interior David Bernhardt in his office.  *Id.*

Neither of these meetings was open to the public.

      At its final meeting on October 16-17, 2019, the Council committed to providing

Defendants with a summary of its findings and conclusions, ideally within 45 days.  AR:2980.  But

---

[4] *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017) (challenging Zimbabwe elephant trophy import ban)*; Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17 (D.D.C. 2013) (challenging ESA listing of three antelope species); *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1206 (N.D. Cal. 2009) (challenging forfeiture and seizure of leopard trophies).

on December 21, 2019, the Council's charter evidently lapsed.  *Compare* AR:0019 (providing that charter would terminate two years from filing unless renewed) *with* AR:0025 (filing charter on December 21, 2017).  *See generally* 5 U.S.C. § App. II § 14 (describing termination and renewal of advisory committees).  Accordingly, the Council can no longer meet or take any action whatsoever. *Id.* § 9(c).  If the Council has fulfilled its commitment to provide Defendants with a final summary of its findings, Defendants have not released that document to the public.

## STANDARD OF REVIEW

Because FACA does not provide its own standard or scope of review, or a cause of action, this case is brought under the standards set forth in the Administrative Procedure Act ("APA").  *See* 5 U.S.C. §§ 701-704.  Under the APA, a reviewing court may "compel agency action unlawfully withheld or reasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "adopted without observance of procedure required by law." *id.* § 706(2)(E), or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).  An agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

Plaintiffs are entitled to summary judgment on each of their four claims for relief. Defendants paid no heed to the consultation requirements of FACA Section 9, did not fairly balance the Council as required by FACA Section 5(b)(2), failed to consider the potential of undue influence

by special interests within the meaning of FACA Section 5(b)(3), and, in violation of FACA Section 10, unlawfully closed meetings of both the full Council and its subcommittees. [5]

## I.   The Council Is Unlawful.

### A.  The Council Is Unlawfully Established.

In their rush to charter the IWCC, Defendants flouted the congressional and regulatory guardrails protecting against needless advisory committees.

*First*, Defendants neglected to consult with GSA and comply with internal agency procedures for establishing advisory committees.  The Department failed to provide GSA with the requisite statements of need and duplication of resources.  41 C.F.R. § 102-3.60(b)(1), (2).  It did not meaningfully solicit, obtain, or incorporate GSA's opinion on the IWCC's draft charter or its membership balance plan, establishing the Council without waiting a reasonable time for GSA to review those documents.  *Id.* § 102-3.60(a), (b)(3).  *See also* 5 U.S.C. App. II § 9(a)(2).  And it failed to provide the Secretary of the Interior with a memorandum with the information prescribed by 308 DM § 2.6.  These omissions render the IWCC void *ab initio*: "when an agency has taken action without observance of the procedure required by law, that action will be set aside."  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004).  *See W. Org. of Res. Councils*, 2019 WL 3805125, at *4 (finding Department violated Section 9 where agency did not provide documents "to . . . GSA prior to the charter being signed" and "ignored the . . . feedback it got from [GSA]").

*Second*, the documents Defendants *did* prepare and (occasionally) submit to GSA do not satisfy FACA's requirements.  To wit: Defendants' Membership Balance Plan does not comport with 41 C.F.R. §§ 102-3.60(b)(3), which requires that the Plan "ensure that, in the selection of

---

[5] In rejecting Defendants' Motion to Dismiss for want of standing the Court considered and specifically cited standing declarations submitted by Plaintiffs.  *See NRDC*, 2019 WL 4601722, at *5-6, 12, 15.  Those declarations likewise supply the "specific facts," provided through "affidavits or other evidence," sufficing to show standing at summary judgment.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).

members for the advisory committee, the agency will consider a cross-section of those directly

affected, interested, and qualified, as appropriate to the nature and functions of the advisory

committee."  The IWCC's Balance Plan, by contrast, simply recites vague, high-level categories of

membership without articulating which stakeholders are "affected" by or "interested" in the IWCC

or which are qualified to serve as Council members.   AR:0008-09.  (For example, the Balance Plan

does not explain why "firearm manufactures" have any expertise or interest in international wildlife

conservation, much less the type of interest that would entitle them to an entire *category* of Council

representation.)  The Plan's perfunctory "statement that [the necessary] factor[s] w[ere] considered

. . . is not a substitute for considering [them]," and confirms that Defendants neglected their

procedural obligation to consider membership balance during GSA consultation.  *Getty v. Fed. Sav.

& Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).  *See W. Org. of Res. Councils*, 2019 WL

3805125, at *6.

    The IWCC's "Justification Statement" is similarly vague, and establishes that Defendants

failed to consider the overriding command of FACA, GSA regulations, and the Department Manual,

i.e., that agencies should turn to advisory committees for policymaking guidance only as a last resort.

Assuming that Defendants actually prepared the Justification Statement before Secretary Zinke

signed the IWCC's charter (the record is unclear on this point), the only passage that arguably speaks

to FACA's chief concerns reads in full:

> Why the Committee's functions cannot be performed by other means[:]
>
> The Council advises the Secretary of the Interior on programs to increase public awareness
> domestically regarding the conservation, wildlife law enforcement, and economic benefits
> that result from United States citizens traveling to foreign nations to engage in hunting.
> Additionally, the Council advises the Secretary on the benefits international hunting has on
> foreign wildlife and habitat conservation, anti-poaching and illegal wildlife trafficking
> programs, and other ways in which international hunting benefits human populations in
> these areas.

AR:00011.

This nonspecific, boilerplate description of what the Council ostensibly *does* says nothing as to "*why* the advisory committee is essential to the conduct of agency business and in the public interest," 41 C.F.R. § 102-3.60(b)(1) (emphasis added), "*why* the advisory committee's functions cannot be performed by the agency, another existing committee, or other means such as a public hearing," *id.* § 102-3.60(b)(2) (emphasis added), or which "alternative actions were considered and reasons why each alternative was not acceptable," 308 DM §§ 2.6.(B)(1)(b). *See also id.* §§ 2.5(B), 2.6(B)(1)(c); *W. Org. of Res. Councils*, 2019 WL 3805125, at *6-7. These omissions are particularly striking because Defendants had already convened two advisory committees with mandates encompassing analysis of international trophy hunting, *see* Ex. E at 3-5, and because the Department of the Interior already examines the potential "benefits" of trophy hunting as part of its day-to-day activities, as when it considers whether import permits under the ESA will "enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). *See generally Safari Club Int'l*, 878 F.3d at 321 (describing enhancement findings under ESA and CITES). Taken with the Council's balance plan, these omissions demonstrate that Defendants' consultation submission to GSA would have fallen short even were it otherwise complete and genuinely solicitous of GSA's expertise.

*Third*, the Department did not reasonably conclude that the IWCC was in the public interest. 5 U.S.C. § App. II § 9(a)(2). 41 C.F.R. § 102-3.60(b)(1). Although Defendants offered a conclusory statement to that effect, the statement was made without the body of analysis contemplated by FACA and implementing regulations, and therefore could not have considered the factors germane to the public interest inquiry, i.e., the Council's transparency, membership balance, and importance to the agency's decisionmaking. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Because an "agency's statement must be one of reasoning," Defendants' conclusory public interest determination is arbitrary and capricious. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation omitted). *See W. Org. of Res. Councils*, 2019 WL 3805125, at *7.

13

Defendants cannot explain away their failures as "technical" or "harmless." To the contrary, they strike at the heart of Congress' determination that modulating advisory committee *formation* is necessary to prevent opaque, biased, or wasteful committees. *See Pub. Citizen*, 491 U.S. at 453. Here, for example, there was no process antedating the IWCC's creation, and the result was exactly as Congress feared: "[a] costly committee[] . . . dominated by representatives of industry and other special interests seeking to advance their own agendas." *Cummock*, 180 F.3d at 284. *See* AR:0005 (estimating cost of Council at $250,000 per year). By the same token, following the required procedures might have prompted Defendants to appoint a more diverse Council membership, open Council proceedings to the public, or utilize preexisting agency processes in place of the IWCC. By foreclosing those possibilities, Defendants' failure to consult doomed the IWCC from the onset. *See Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (recognizing rule that agencies' "failure . . . to follow their own established procedures [is] . . . reversible error" and noting that doctrine's "ambit is not limited to rules attaining the status of formal regulations").

### B. The Council Is Not Fairly Balanced.

The record shows that the Council was not "fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. App. II § 5(b)(2). Relying on common definitions of "fair" and "balance," this Court has characterized the test under FACA Section 5(b)(2) as asking whether an advisory committee's overall membership is "characterized by honesty, impartiality, [and is] equitable[,]" *NRDC*, 2019 WL 4601722, at *13 (quotation omitted), and, "more concrete . . . still," whether it "equalize[s] in number, force, or effect" or "measure[s] competing interests and offset[s] them appropriately." *Id.* (quotation omitted). *See also* 41 C.F.R. Pt. 102-3, Subpt. B, App. A (recognizing agencies' "need to obtain divergent points of view"). In undertaking this inquiry, the Court may rely on Congress' view that "a [member's] viewpoints c[an] be inferred from his or her background and employment status."

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 437 (D.C. Cir. 1989) (Edwards, J., concurring). *See also Cargill, Inc. v. United States*, 173 F.3d 323, 337 (5th Cir. 1999) (evaluating claim with reference to members' profession and expertise).

The Secretary did not "appropriately offset" "competing interests" for Council membership because he did not offset those interests *at all*. Defendants understood the public to overwhelmingly support Council membership for organizations that raised concerns about trophy hunting's conservation value. *See* Ex. C. And Defendants knew that Plaintiffs' critiques of the Council— which echoed and built on the public's concerns—were easily the most thorough and scientifically robust comments before agency decisionmakers. *See* Exs. E, F. Yet Plaintiffs' point of view was entirely shut out from the committee's membership, to the point where Defendants apparently rejected Plaintiffs' nominee for Council membership out of hand. AR:0029-30. If there is any question whether this type of wholesale blacklisting is "characterized by honesty, impartiality, and is equitable," Congress has already answered in the negative, characterizing FACA as a response to advisory committee where "*[n]o* representatives of conservation . . . were present." H.R. Rep. No. 92-1017 at 6 (emphasis added). *See also Nw. Ecosystem All. v. Off. of U.S. Trade Rep.*, No. C99-1165R, 1999 WL 33526001, at *5 (W.D. Wash. Nov. 9, 1999) (finding violation of Section 5(b)(2) where "Plaintiffs' opinions on . . . matters [were] directly contrary" to the "objectives" of the committee writ large).

### C. Defendants Did Not Institute Appropriate Safeguards Against Special Interests.

In contravention of FACA Section 5(b)(3), the Council's charter does not "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest[.]" 5 U.S.C. App. II § 5(b)(3), (c). An agency has violated Section 5(b)(3) when it "did not even take any steps at all to accomplish" the Section's goals, *NRDC*, 2019 WL 4601722, at *16 (citing *Mach Mining,*

*LLC v. E.E.O.C.*, 575 U.S. 480 (2015)), or when it contains an inordinate number of members who are "directly affected" by the committee's work. *Cargill*, 173 F.3d at 339. *See also Microbiological Criteria*, 886 F.2d at 425 (Friedman, J., concurring) (recognizing Congress' desire to prevent a concentration of special interests capable of "overwhelm[ing] a federal decision maker") (citation omitted).

As Plaintiffs advised the Secretary before he appointed Council membership (but after he had surreptitiously signed the Council's charter), the Council's design risked allowing a "regulated industry"—the pro-trophy hunting lobby—to "mediate" the terms of those regulations. *See* Ex. D at 13-14. Most, obviously, the Council's provision for majority membership from organizations that financially benefit from trophy hunting invited those organizations to "overwhelm" Defendants with parochial advice flowing from their own self-interest. *Microbiological Criteria*, 886 F.2d at 425 (Friedman, J., concurring). And even if the Council's members were not advocating on behalf of their respective organizations as such, the members' personal stake in importing wildlife trophies constituted an impermissibly direct interest in the Council's mandates to "[r]ecommend[] removal of barriers to the importation into the United States of legally hunted wildlife" and "review of import suspension/bans." AR:0004.

There is no evidence that Defendants considered these conflicts or "t[ook] any steps . . . to accomplish" an unbiased committee. *NRDC*, 2019 WL 4601722, at *16. The Council's charter contained only a barebones ethics provision prohibiting members from participating in "deliberations or votes relating to a specific party matter [already] before the Department or its bureaus and offices . . . in which the member or the entity the member represents has a direct financial interest." AR:0007. But this provision's focus on matters in which members *have* a "direct *financial* interest," *id.* (emphasis added), did not prohibit members from advising the Secretary on matters that *will* or *could* "directly affect" them, financially or otherwise. *Cargill*, 173 F.3d at 339. For

example, the Council's charter does not prevent members from lobbying the Department of the

Interior to relax ESA and CITES import restrictions for species that the members have hunted or

plan to hunt.  Nor did the charter account for the distinct possibility that the Council's

overrepresented organizations would cultivate a policymaking monoculture inappropriately

influenced by their common affiliations rather than a climate of "independent judgment."  5 U.S.C.

App. II § 5(b)(3), (c).

As Plaintiffs have observed, these were not idle concerns.  Council member John Jackson,

President of Conservation Force, participated in Council deliberations on the federal prohibition on

importing lion trophies from Tanzania, *see* AR:1888; AR:1891, even though he routinely submits

applications for import permits for Tanzanian lion trophies on behalf of Conservation Force

members.  *See* ECF No. 46 ¶ 7.  And Council transcripts frequently reflect members' understanding

that they comprised a single, unified front against points of view such as Plaintiffs'.  ECF No. 45 at

8-9.  This conduct only underscores that the Council's formation violated FACA Section 5(b)(3).

### D.  Defendants Unlawfully Shielded The Council From Public Oversight.

The Department violated FACA Section 10 in two respects.  First, it failed to open

subcommittee records and proceedings to the public.  The Court has already determined that

Defendants were obligated to provide that access pursuant to 41 C.F.R. § 102-3.35(a), which allows

agencies to "apply[] any provision of FACA and [FACA's] implementing regulations to any

subcommittee . . . in any particular instance."  *See NRDC*, 2019 WL 4601722, at *10.  In this case,

the IWCC was established, chartered, and managed under Department guidance that applied FACA

Section 10 to the Council's subgroups, triggering the exception in 41 C.F.R. § 102-3.35(a) and

subjecting those bodies to public scrutiny.  *NRDC*, 2019 WL 4601722, at *11.  Moreover, the

relevant chapter of the Department Manual had the force of law and required Defendants to open

subcommittee meetings and records regardless of the GSA regulations. *Id.* at *6.[6]  In either case, the Manual precluded Defendants from closing Council proceedings.

Defendants also violated FACA Section 10 when Department officials (including the Secretary and Deputy Secretary of the Interior) met with members of the Council for several hours outside of public view.  These gatherings—in which special interests spoke directly to federal decisionmakers in a cabinet secretary's office and under a federal imprimatur—is exactly the type of opaque, unseemly activity Congress sought to prevent when it passed FACA.  *See Pub. Citizen*, 491 U.S. at 446.  Indeed, career officials at the Department of the Interior warned that the agency "[c]annot have the full committee together at one time [because that] would be against FACA rules." *See* AR:1899.  By ignoring these warnings and convening the Council is secret, Defendants violated FACA Section 10.

## II.     The Court Should Order Defendants To Release All Council Records And Enjoin The Department From Relying On The IWCC's Work Product.

The Court should declare that Defendants have violated FACA Sections 5, 9, and 10, FACA's implementing regulations, and the Department Manual.  Moreover, the Court should order Defendants to open subcommittee and working group records for inspection, and to provide Plaintiffs with access to the internal Council materials they would have received if they were appropriately represented on the Council.  *See J. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 30 (D.D.C. 2002) ("whether . . . relief is available is contingent not on the continued

---

[6] The Court has noted that in *Western Organization of Resource Councils v. Bernhardt*, 362 F. Supp. 3d 900, 914 (D. Mont. 2019) the District of Montana "reached the same conclusion" when denying the Department's Motion to Dismiss.  *NRDC*, 2019 WL 4601722, at *11.  On summary judgment, the Montana District Court revisited its holding and determined that the Department Manual *did not* bind Defendants.  *See W. Org. of Res. Councils*, 2019 WL 3805125, at *5; ECF No. 59 at 1 n.2 (notifying Court).  Plaintiffs respectfully disagree with the District of Montana's more recent examination of the Department Manual for the reasons set forth in their opposition to Defendants' Motion to Dismiss.  *See* ECF No. 45 at 28-29 & n.19.  In any event, the more recent holding does not address this Court's foremost reason for applying the Manual to subcommittees, namely that the Manual triggers the exception in 41 C.F.R. § 102-3.35(a).

existence of the group, but on the continued existence of the records and information"). Should the Court grant this relief, Plaintiffs are further entitled to "the . . . discovery and fact finding" necessary to ascertain the full scope of the subcommittees' activities, including any recommendations they rendered directly to the Secretary of the Interior. *Cummock v. Gore*, 180 F.3d 282, 293 (D.C. Cir. 1999).

Finally, the Court should enjoin Defendants from relying on any IWCC recommendations or work product in future agency actions. As the Eleventh Circuit has explained, "to allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of [FACA]" and a use injunction is therefore the "only vehicle that carries the sufficient remedial effect to ensure future compliance with FACA's clear requirements." *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994). Other courts describing a use injunction as a "last resort," have also explained that FACA violations will typically exhaust less intrusive remedies. Thus, the Fifth Circuit has held that use injunctions are appropriate in most but not all circumstances. *Cargill*, 173 F.3d at 342 ("there *occasionally* may be FACA violations that are either *unintentional* or so *de minimis* as not to warrant" injunctive relief) (emphasis added). And the D.C. Circuit has added that a use injunction is appropriate if its "unavailability . . . would effectively render FACA a nullity." *Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996).

A use injunction is appropriate in this case because Defendants brazenly violated nearly all of FACA's keystone requirements, chartering the IWCC without adequate process, stacking the Council with special interests, and then closing meetings to the public. If allowed to stand, this scheme would indeed render FACA a nullity. *See W. Org. of Res. Councils v. Bernhardt*, No. CV 18-139-M-DWM, 2019 WL 3805125, at *10 (D. Mont. Aug. 13, 2019) (granting use injunction where "FACA violation at issue . . . [went] to the very creation and existence of the advisory committee") Nor does this case resemble those instances where courts have explicitly or implicitly rejected use

injunctions.  This is not a case, for example, where a use injunction would necessitate the costly formation of a new Council, *Cal. Forestry Ass'n*, 102 F.3d at 614, would upset decades-long reliance on the Council's work product, *Nw. Ecosystem All. v. Off. of the U.S. Trade Rep.*, 1999 WL 33526001, at *8, or where there is "no evidence suggesting" that the Council would have operated differently but-for the FACA violations.  *Akzo-Nobel, Inc. v. United States*, No. 00-30834, 2001 WL 34772206, at *3 (5th Cir. May 25, 2001).  *Accord Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) (speculating that a use injunction may be inappropriate where "the plaintiff . . . fail[s] to prosecute its claim . . . promptly[,]" and files its complaint after the committee dissolves).  In short, a use injunction would be narrowly tailored, with little or no effect outside of the IWCC's tainted work product.[7]

## CONCLUSION

The Court should grant Plaintiffs' motion and enter appropriate relief.

Dated: January 6, 2020.                          Respectfully submitted,

                                                 /s/ Travis J. Annatoyn
                                                 Jeffrey B. Dubner
                                                 Travis J. Annatoyn
                                                 Democracy Forward Foundation
                                                 P.O. Box 34553
                                                 Washington, D.C. 20043
                                                 (202) 601-2483
                                                 jdubner@democracyforward.org
                                                 tannatoyn@democracyforward.org

                                                 *Attorneys for Plaintiff*

---

[7] Most cases issuing use injunctions do not explicitly apply the four-factor test for injunctive relief following success on the merits, *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 422 (2d Cir. 2013), but the frequency of use injunctions conforms that they are compatible with that test. Here, Plaintiff has shown (1) that it has suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See supra* at 12 n.5, 19-20.